**Lynnwood CAMPBELL, Petitioner,**

v.

**MERIT SYSTEMS PROTECTION BOARD, Respondent.**

No. 93–3483.

United States Court of Appeals, Federal Circuit.

June 6, 1994.

Anthony J. Trenga, Hazel & Thomas, P.C., Alexandria, VA, argued, for petitioner. With him on the brief, was John A. Burlingame.

Michael K. Martin, Atty., Merit Systems Protection Bd., Washington, DC, argued, for respondent. With him on the brief, were Mary L. Jennings, Deputy Gen. Counsel and Martha B. Schneider, Asst. Gen. Counsel.

Before RICH and CLEVENGER, Circuit Judges, and MILLS, District Judge.[1]

CLEVENGER, Circuit Judge.

This case involves the Hatch Political Activities Act, 5 U.S.C. § 7324(a)(2) (1988) (Hatch Act), which prohibits certain federal employees from "tak[ing] an active part in political management or in political campaigns." More precisely, the case deals with an exception to the Hatch Act. Pursuant to 5 U.S.C. § 7327 (1988), the Office of Personnel Management (OPM) may prescribe regulations permitting certain persons otherwise subject to § 7324—those resident in political subdivisions in Virginia in the immediate vicinity of the District of Columbia—to take an active part in political management and political campaigns involving the municipality in which they reside. OPM has promulgated such a regulation, which enables the residents of Alexandria, Virginia, inter alia, to participate actively in partisan elections, but only as "independent candidate[s]." 5 C.F.R. § 733.124(c)(1) (1993). In 1991 Lynnwood Campbell ran for a seat on the Alexandria

---

1. The Honorable Richard Mills of the Central District of Illinois, sitting by designation.

City Council while working for an agency of the Federal Government covered by the Hatch Act. The Office of Special Counsel of the Merit Systems Protection Board (Board) filed a complaint under 5 U.S.C. § 1206(g) (1988) charging Campbell with being too closely associated with a major political party to fall within the exception permitting federal employees to run in partisan elections as "independent candidate[s]." The Board sustained the charge and ordered Campbell suspended without pay for thirty days, which is the minimum penalty provided by law, 58 M.S.P.R. 170. Campbell seeks judicial review in this court under 5 U.S.C. § 7703(b)(1) (1988). We affirm.

## I

Campbell first ran for the Alexandria City Council while working for the Federal Home Loan Bank Board in 1985. While Campbell appeared as an "Independent" on the ballot, he advertised that he had been "Endorsed by the Alexandria Democratic Committee" (ADC). In campaign literature, he initially went so far as to say that he was, and considered himself to be, "a full member of the Democratic ticket." When the Office of Special Counsel learned of his "full member" claim, it issued a letter warning Campbell that the claim constituted a violation of the Hatch Act and that any further violations would be considered willful and could lead to his removal.

In 1989, Campbell began preparations to run again in the 1991 city council election. His plan included seeking the endorsement of the Democratic Party while running as an independent candidate. At the time, he was working for the Office of Regulatory Affairs, which is an agency not covered by the Hatch Act. That October, however, Campbell again became subject to the Hatch Act when he accepted a job at the newly-created Office of Thrift Supervision (OTS). Concerned with possible Hatch Act implications of his intended candidacy, Campbell sought advice from an OTS attorney and ethics advisor, Caroline Morris.

While still awaiting guidance from Ms. Morris, Campbell worked with two supporters connected with the party to devise a new procedure, parallel to the one for nominating party candidates, whereby federal employees forced to run as independents under 5 C.F.R. § 733.124(c)(1), nevertheless could, upon payment of a $200 registration fee and placement in the top six candidates at a party caucus, gain the official endorsement of the party. The party adopted the new procedure when presented to it for a vote.

When Ms. Morris reported back to Campbell concerning his inquiry, she initially took the position, based on conversations with attorneys in the Office of Special Counsel of the Board, that while one passively may receive a party endorsement without violating the Hatch Act, an employee can neither seek it nor advertise it. Ms. Morris later changed her position, however, after learning that an employee of a different agency had run for sheriff in Alexandria as an independent with the Democratic Party endorsement without being charged with a Hatch Act violation. She then advised Campbell that in her opinion, he could both seek the new procedure endorsement and advertise it without violating 5 C.F.R. § 733.124(c)(1).[2]

Campbell proceeded to do just that, collecting enough votes at the caucus in February 1991 to place among the six persons the ADC would support in the upcoming election, and soon thereafter disseminating campaign literature through various media touting his endorsement. Consistent with its advice rendered initially to Ms. Morris that actively seeking the party's endorsement or advertising receipt of the endorsement is impermissible, the Office of Special Counsel filed a complaint with the Board in October 1991 charging Mr. Campbell with violating the Hatch Act.

On October 28, 1991, the Board assigned Campbell's case to the Chief Administrative Law Judge (CALJ) for adjudication under 5 U.S.C. § 557 (1988). The parties agreed that the case could be decided on written submis-

---

**2.** Mr. Campbell has never argued that he was entitled to rely on the opinion of agency counsel or that it had any legal force or effect.

sions. The Special Counsel argued that Campbell, though a de jure "Independent," was a de facto Democratic nominee—not only because he had actively sought the political support of the party and advertised it, but also because he had availed himself of party facilities and benefitted in various other ways from party largesse. *Special Counsel v. Lynnwood Campbell*, No. CB1216920001T1, slip. op. at 6–7 (MSPB Apr. 24, 1992) (CALJ's Recommended Decision). The Special Counsel also argued that Campbell's status as an independent under Virginia law should not be dispositive, citing *Special Counsel v. Yoho*, 15 M.S.P.R. 409 (1983), *overruled on other grounds, Special Counsel v. Purnell*, 37 M.S.P.R. 184, 200–02 (1988), *aff'd sub nom. Fela v. Merit Sys. Prot. Bd.*, 730 F.Supp. 779 (N.D.Ohio 1989), in which the Board deemed an election partisan for purposes of federal law even though it was non-partisan under state law.

Campbell countered that the regulatory phrase "independent candidate" ought to be interpreted to mean, essentially, anyone who is formally registered "Independent" under state law and so appears on the ballot. *Campbell*, slip op. at 7–9. This would create a per se rule that such a showing establishes as a matter of law at least a rebuttable presumption of independent status under § 733.124(c)(1).

The CALJ rejected Mr. Campbell's interpretive argument that in common parlance, the phrase "independent candidate" necessarily means a candidate who qualifies to run as an "Independent" under state law, holding that "it is not the label [a candidate] places on his candidacy, it is the total picture— including [the candidate's] comportment— [that] provides the basis for a determination of ... status." *Id.* at 12. He then found that Campbell had forfeited his claim to independence by "actively and aggressively" participating in party politics in a way that was identical in substance if not in form to that practiced by overt partisans seeking the nomination of the party. *Id.* at 13. The CALJ also noted that Campbell not only sought the endorsement of the party, but actually devised and proposed the adoption of the novel procedure by which he could do so.

In addition, Campbell used ADC headquarters as an office and allowed party members to promote his candidacy. From all this, the CALJ inferred that Mr. Campbell's "unmistakable intent" was to create the impression that he was in league with the nominees "running under ADC's banner," and that his conduct "leads the voters to assume logically he would adhere to the party's plans, programs and platforms." *Id.* at 14–15. Accordingly, he concluded that Mr. Campbell did not fall within the "independent candidate" exception of § 733.124(c)(1) and thus violated the Hatch Act. *Id.*

With regard to the recommended penalty, the CALJ opined that Campbell's violation was not deliberately defiant, in that he had sought advice from the agency counsel and had displayed some caution in attempting to avoid violation of the Hatch Act. The CALJ, citing *Special Counsel v. Brondyk*, 42 M.S.P.R. 333 (1989), further noted that responsibility for violation of the Hatch Act is not excused by reliance on poor advice. Considering all the circumstances of the case, the CALJ agreed with the Special Counsel that the minimum statutory penalty of thirty days suspension without pay was appropriate in Campbell's case.

Campbell petitioned the Board for review of the CALJ's decision. The Board granted the petition and affirmed the CALJ substantially on the CALJ's reasoning, and unanimously adopted the CALJ's recommended penalty. Campbell then sought review in this court.

## II

Campbell's appeal proceeds from the premise that the ultimate, case-dispositive conclusion as to whether a person is an "independent candidate" within the meaning of 5 C.F.R. § 733.124(c)(1) is a question of law. He thus argues that this particular case presents a pure question of law concerning the proper interpretation of the regulatory phrase "independent candidate." Campbell urges this court to set aside the Board's conclusion that Campbell was not an "independent candidate" on the grounds that it does not comport with the plain, ordinary meaning of the term as supplied by state law,

and is therefore erroneous. Campbell argues further that the Board committed reversible error by relying on the twin circumstances that some ADC workers and another person had described Campbell as a "Democrat" during the campaign, and Campbell did not then make every effort to clear up any misimpression that he was not in fact an independent candidate. Mr. Campbell contends that as a matter of law, he cannot be held responsible for the actions of third parties.

The government views the issue on appeal quite differently. Whether a candidate is "independent" cannot turn on a label provided under state law, the government contends. One's independence or lack thereof must be determined by examination of the facts in each case. In a nutshell, the government emphasizes these facts:

> Like the Democratic Party nominees to the partisan election, Campbell actively sought the endorsement of the ADC, and once it was awarded, he frequently and proudly advertised it. He had no campaign headquarters, working instead out of the headquarters of the ADC, as the nominees did. He made use of the ADC's telephones, its bulk mail permit, and its volunteers, as did the Democratic Party nominees.

In sum, the government asserts that the facts of the case condemn Campbell's claim to a campaign conducted in an independent manner as a truly independent candidate. Campbell thus fails to meet the criteria for exempting his political conduct from the strictures of the Hatch Act.

### III

The power of courts to disturb the actions of administrative agencies is generally quite limited. In appeals from the Board, Congress has directed this court to review the record and set aside only those

> agency action[s], findings, or conclusions found to be—(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence.

5 U.S.C. § 7703(c) (1988). Precisely which of these standards applies to a particular issue on appeal depends on the nature of both the agency action and the question presented. *See Association of Data Processing Serv. Orgs. v. Board of Governors of the Federal Reserve Sys.*, 745 F.2d 677, 681–82 (D.C.Cir. 1984) (Scalia, J.); 2 Steven Alan Childress & Martha S. Davis, Federal Standards of Review § 16.01, at 16–5 (1992). Conclusions of fact in agency adjudications are generally governed by the substantial evidence test. *Association of Data Processing*, 745 F.2d at 685; 2 Childress & Davis, *supra*, § 17.01, at 17–3. That test requires courts to defer as long as the record contains evidence from which one reasonably could draw the challenged inference—even though there is other evidence which, if believed, would permit the contrary inference, *see, e.g., Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed.Cir.1984) (quoting *Consolidated Edison Co. v. National Labor Relations Bd.*, 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938) and *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966)).

Conclusions of law, by contrast, are reviewed de novo, it being, "emphatically, the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). The threshold question in this appeal is whether the Board's determination that Mr. Campbell was not an "independent candidate" is, for purposes of judicial review, properly characterized as a finding of fact, or, as appellant would have it, a conclusion of law. *See* John Dickinson, Administrative Justice and the Supremacy of Law in the United States 55 (1927) (question whether a particular case falls within the ordinary meaning of a statutory term is "doubtless a question of fact;" but "is with equal truth a question of statutory construction.") This is a question of first impression in this court. Selection of the proper standard of review being, self-evidently, a matter of law, we conduct our examination de novo.

## IV

It is often difficult to distinguish factual inferences from legal conclusions. *See Pullman–Standard v. Swint,* 456 U.S. 273, 288, 102 S.Ct. 1781, 1790, 72 L.Ed.2d 66 (1982). Indeed, this case reveals the falseness of the fact-law dichotomy, since the determination at issue, involving as it does the application of a general legal standard to particular facts, is probably most realistically described as neither of fact nor law, but mixed. *See generally* Francis H. Bohlen, *Mixed Questions of Law and Fact,* 72 U.Pa.L.Rev. 111, 115 (1924). Mixed questions sometimes are impossible to categorize through sheer logic. *See Pullman–Standard,* 456 U.S. at 288, 102 S.Ct. at 1790. Somewhere near the middle of the fact-law spectrum, a "finding of fact shades imperceptibly into a conclusion of law." Louis L. Jaffe, Judicial Control of Administrative Action 546–50 (1965). The mixed questions in this zone of logical overlap fairly can be conceptualized as either essentially factual or essentially legal because they have a substantial normative element, yet are case-specific. For example, the court in *East v. Romine, Inc.,* 518 F.2d 332, 338–39 (5th Cir.1975), *overruled on other grounds in Pullman–Standard,* 456 U.S. at 288, 102 S.Ct. at 1790, held that a finding of discriminatory intent under Title VII is question of fact (albeit a question of "ultimate fact" subject to de novo review), whereas the court in *Stewart v. General Motors,* 542 F.2d 445, 449 (7th Cir.1976), noting the "ultimate fact" doctrine, observed that a "statement that discrimination exists ... under Title VII ... is as much a conclusion of law as a finding of fact." *See also Antilles S.S. Co. v. American Hull Ins. Syn.,* 733 F.2d 195, 203–07 (2d Cir.1984) (noting the split of authority over whether the meaning of a contract is a question of fact, law, or both).

In cases such as this, which fall within the zone of logical overlap, "[t]here [can be] no fixed distinction.... The knife of policy alone effects an artificial cleavage at the point where the court chooses to draw the line...." Dickinson, *supra,* at 55. The court in *Mamiye Bros. v. Barber S.S. Lines,* 360 F.2d 774, 777 (2d Cir.) (Friendly, J.), *cert. denied,* 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966), for example, held that while a negligence determination must be characterized as a question of fact when tried to a jury, it is a question of law when tried to a judge, because in the latter case, there are no constitutional considerations to override concerns about uniformity of result. As these cases suggest, courts in such situations do not decide to defer because they have concluded *a priori* that something is a question of fact, but rather, decide something is a question of fact because they have concluded it is wise policy to defer. *See id.*

The mixed question at issue here, like the question in *Mamiye Brothers* and to a lesser extent *Stewart,* is not sufficiently close to one end of the spectrum or another to permit an easy answer based on logic alone. Characterization therefore must follow from an *a priori* decision as to whether deferring to the Board's application of the "independent candidate" exception to the facts of cases before it is sound judicial policy. We would be less than candid to suggest otherwise. The question thus arises, exactly which policies properly inform the analysis and to what extent?

## V

Courts in such situations typically have balanced considerations of judicial economy, comparative institutional advantage (e.g., the relative expertise of agencies and relative *non-*expertise of juries vis-a-vis judges), and constitutional concerns (e.g., the separation of powers in administrative appeals, and the right of trial by jury in actions at law) against the effect of appellate deference on consistency and uniformity in the law. *See, e.g., Consolo,* 383 U.S. at 619–20, 86 S.Ct. at 1026 (Substantial evidence review of mixed questions "frees the reviewing courts of the *time-consuming and difficult* task of weighing the evidence, it gives proper respect to the *expertise* of the administrative tribunal and it helps promote the *uniform application* of the statute.") (emphasis added); *see Anderson v. City of Bessemer City,* 470 U.S. 564, 574–75, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) (citing the superior position of triers of fact with respect to issues involving witness credibility, and also the judicial economy gained by deferring even to derivative

inferences from non-testimonial evidence); *Bose Corp. v. Consumers Union of the United States*, 466 U.S. 485, 520, 104 S.Ct. 1949, 1970, 80 L.Ed.2d 502 (1984) (Rehnquist, J., dissenting) (characterizing a mixed question as law rather than fact tends to result in "lessened confidence in the judgments of lower tribunals and more entirely factbound appeals"); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–44, 857, 104 S.Ct. 2778, 2781–82, 2789, 81 L.Ed.2d 694 (1984) (default rule of rational-basis deference is predicated upon the separation of powers); *Mamiye Brothers*, 360 F.2d at 777; *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 433 (2d Cir.1945) (L. Hand, J.) (An appellate court "will hesitate less to reverse the finding of a judge than that of an administrative tribunal or of a jury."). We turn now to consider the nature of the determination at issue here in light of the policies underlying standards of review.

If the record before us is any indication, most of the Hatch Act cases will be sui generis, presenting unique combinations of numerous specific episodes that shed light on the question of political independence *vel non*. The ultimate conclusion is simply the net impression created by this totality of circumstances. Such case-specificity severely limits the scope of any one decision's precedential relevance. Few cases will be so factually indistinguishable that apparently divergent results would not be seen best as a function of the peculiarities of the case rather than some deeper normative conflict. This at once minimizes the adverse effect that a deferential standard of review might have on uniformity and maximizes judicial economy by avoiding a rule that would tend to encourage entirely fact-bound appeals.

As for considerations of comparative institutional advantage, the trier is in a better position to make an overall assessment than a court of appeals, because demeanor evidence—invisible to us—ordinarily will be an important ingredient in the mix. Moreover, while the Board is perhaps more akin to a lower court than the typical agency (since Congress assigned it an essentially adjudicatory function, *see Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 151–56, 111 S.Ct. 1171, 1176–78, 113 L.Ed.2d 117 (1991)), its determinations nevertheless represent the actions of an independent branch of government for which Congress prescribed the same standards of review. *Compare* 5 U.S.C. § 7703(c) *with* § 706(2). This suggests the Board is entitled to the same deference typically accorded agencies resolving fact-intensive mixed questions—that is, questions involving the straight application of a rule in need of no further elaboration to highly particularized facts. *See, e.g., NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944) (question whether person is an "employee" or a manager within the meaning of the National Labor Relations Act).

To be sure, the factor of relative expertise as between the Board and this court is not dispositive as to whether the standard of review should be deferential. Because we alone review the Board's decisions under the Hatch Act as they affect federal employees, we are as well versed in the applicable law as is the Board. The Board, however, hears and decides also those Hatch Act cases that are not appealed here, which involve employees of state agencies that receive federal funds. *See* 5 U.S.C. §§ 1502–1503, 1508 (1988). Consequently, the Board has broad exposure to the many varied fact settings in which Hatch Act cases may arise. To the extent that familiarity with factual underpinnings of Hatch Act cases may lead to expertise in deciding such cases, the Board's experience tilts in the direction of according a measure of deference to their conclusions.

Finally, there are no countervailing constitutional concerns that might outweigh the separation of powers and other considerations favoring deference to the agency here. *Cf. Bose*, 466 U.S. at 485, 104 S.Ct. at 1951 (the firstness of the First Amendment dictates de novo review of "actual malice" determination in libel suit despite the cost to judicial economy and the right to trial by jury). Congress unquestionably has the power to forbid federal employees absolutely from running for elective office, for while Mr. Campbell "may have a constitutional right to [run for elective office], ... he has no consti-

tutional right to be a [federal employee]." *McAuliffe v. Mayor of New Bedford,* 155 Mass. 216, 220, 29 N.E. 517 (1892) (Holmes, J.), *quoted with approval in United Public Workers of Am. v. Mitchell,* 330 U.S. 75, 99 & n. 34, 67 S.Ct. 556, 569 & n. 34, 91 L.Ed. 754 (1947) (declaring Hatch Act constitutional). *But cf. Connick v. Myers,* 461 U.S. 138, 143–44, 103 S.Ct. 1684, 1688–89, 75 L.Ed.2d 708 (1983); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (once employed, government employee acquires a property interest in the job that cannot be deprived without due process). It follows that if Congress can forbid federal employees absolutely from running for elective office, *a fortiori* it can permit them to do so subject to non-arbitrary restrictions. The greater power subsumes the lesser. *Cf. McKoy v. North Carolina,* 494 U.S. 433, 450, 110 S.Ct. 1227, 1237, 108 L.Ed.2d 369 (1990) (Blackmun, J., concurring). Applying the minimal scrutiny of rationality review to Board determinations under the "independent candidate" exception does not fairly implicate the First Amendment, much less raise a serious constitutional question.

■ For the foregoing reasons, we hold that the mixed question of "independent candidate" must be placed in the category of fact for purposes of judicial review. We now turn to the merits of this appeal and whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support [the Board's] conclusion" that candidate Campbell was not really independent of a political party. *Matsushita,* 750 F.2d at 933 (citations and internal quotations omitted).

### VI

■ We first address Campbell's argument that independence should be determined by the law of the relevant state. Campbell urges that this interpretation represents *the* ordinary meaning of the term "independent candidate," which if true would constrain this court to adopt it according to the long-settled rule of interpretation. *See, e.g., Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985) (ordinary meaning of language presumed to embody actual legislative

intent); *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979) ("unless otherwise defined, words will be interpreted as taking ordinary, contemporary, common meaning"); *Old Colony R.R. v. Commissioner,* 284 U.S. 552, 560, 52 S.Ct. 211, 213–14, 76 L.Ed. 484 (1932) (same) (quoting *Levy's Lessee v. McCartee,* 31 U.S. (6 Pet.) 102, 110, 8 L.Ed. 334 (1832)); *Weddel v. Secretary of Health and Human Servs.,* 23 F.3d 388, 391 (Fed.Cir.1994); *see also* Oliver Wendell Holmes, *The Theory of Legal Interpretation,* 12 Harv.L.Rev. 417, 417–19 (1899) ("[W]e ask, not what [the drafters] meant, but what those words would mean in the mouth of a normal speaker of English, using them in the circumstances in which they were used.").

■ Campbell's argument, however, is unpersuasive. First, as indicated below in Part VII, the definition of "independent" he proposes is not among the dictionary definitions of the word and *a fortiori* is not the only permissible meaning of the regulatory term. And because we have concluded that a determination as to independence is a question of fact, we are not permitted to choose what we believe is the best of the permissible meanings, as we might be obliged to do if review were de novo. As long as the facts fit comfortably into one or more of the permissible meanings, the trier's judgment is not unreasonable and must be sustained under our limited standard of review.

Second, the term "independent candidate" is not uniquely a term of legal art, so foreign to common parlance that the regulator's use of that phrase could displace the strong presumption that ordinary dictionary definitions embody the intent of the drafters of public law. *Compare Park 'N Fly,* 469 U.S. at 194, 105 S.Ct. at 661 *with Evans v. United States,* —— U.S. ——, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992) (when drafters " 'borrow[ ] terms of art . . . [they] presumably know[ ] and adopt[ ] the cluster of ideas that were attached . . . in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.' ") (citation omitted) *and Lynch v. Alworth–Stephens Co.,* 267 U.S. 364, 370, 45 S.Ct. 274, 276, 69 L.Ed. 660

(1925) ("[T]he plain ... meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover.").

Finally, even if the phrase "independent candidate" were to be given a specialized meaning, we are persuaded that looking to state law would be unwise. To begin with, the Supreme Court long ago rejected precisely the same argument in another administrative setting on the grounds that defining the term of a federal statute according to the vagaries of state law would create disuniformity, *see Hearst Publications,* 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (meaning of the term "employee" under the National Labor Relations Act; noting also the disuniformity that placing this mixed question in the law category would create even if cast as a rule of federal common law, what with the risk of multifarious pronouncements from the various circuits that would be left to develop it). There is no substantial offsetting benefit in terms of federalism, which in certain circumstances might require federal courts to tolerate a certain amount of disuniformity in the application of federal statutes. *See McCall Stock Farms, Inc. v. United States,* 14 F.3d 1562, 1569 n. 6 (Fed.Cir.1993) (collecting cases).

Most important, reducing the factual inquiry into "independence" to an examination of a person's registration card and ballot billing would exalt form over substance and permit circumvention of the substantive congressional policy of keeping partisan politics out of the routine administration of the laws and the running of the bureaucracy. *See United Pub. Workers of Am. v. Mitchell,* 330 U.S. at 99–101, 67 S.Ct. at 569–570 (reciting the purposes of the Hatch Act). Appellant has not made the sort of showing necessary to warrant the creation of a per se rule, either presumptive or dispositive: There is no evidence that formal independence correlates highly with real independence or that inherent problems of proof or docket crowding makes such a proxy desirable as a matter of either justice or judicial economy.

## VII

Having decided that the drafters of 5 C.F.R. § 733.124(c)(1) must be presumed to have intended the common meaning of "independent" to modify "candidate," our task is simply to determine whether a reasonable mind could conclude that one or more of the relevant definitions of the word does not fairly describe Campbell. Webster's defines "independent" as, among other things, "not relying on others"; "not dependent for support or supplies"; "not subject to bias or influence"; "[n]ot bound by party; exercising a free choice in voting with either or any party." Webster's New Int'l Dict. of the English Language 1094 (1932). The Oxford English Dictionary defines the word similarly as "[n]ot depending on the authority of another"; "acting, conducted, or obtained in a way apart from and unaffected by" another; "[n]ot ... having to rely on another for support or supplies"; "[n]ot depending on others for the formation of opinions or guidance of conduct; not influenced or biased by the opinions of others; thinking or acting ... for oneself." 5 Oxford English Dictionary 200 (1933).

Even a cursory examination of the record reveals ample evidence to support the Board's finding that Campbell was not politically "independent." Campbell approached a major party at the outset of his campaign and not only solicited its political support for his candidacy, but actually proposed the adoption of a special new procedure by which federal employees—who obviously could not gain such support through the normal procedure of being "nominated" and still claim "independent" status—nevertheless could secure the "endorsement" of the party. The party leadership adopted the new procedure. Campbell later spoke at a party rally, where he was introduced, equivocally, as an independent candidate seeking the party's endorsement. He expressed his gratitude to the leadership for adopting the new procedure. People running for the party nominations also made speeches.

The party later convened a caucus to elect the six people to be held up for the upcoming city council election via "nomination" or "endorsement." That is to say, if Campbell

placed in the top six at the caucus, the party would nominate only five candidates and give him the last place on the slate as an "endorsee." As it turned out, Campbell received enough votes to place, defeating two overtly partisan would-be nominees in the process.

After his victory at the primary level, Campbell held himself out as someone who enjoyed the political support of the Democratic party. One flyer, for example, bore the inscription: "Endorsed by the Alexandria Democratic Committee." Campbell advertised himself thus in the Alexandria Gazette as well. The inside of the flyer read:

> As a federal worker, I am running for Council as an Independent. However, I have been endorsed by the Democratic Party. I have been fully supported by the Democratic Team.

(Emphasis added). The candidate used similar language in a mass mailing to Alexandria voters:

> Because I am a federal worker ... I am required to run as an Independent. I have been fully endorsed by the Alexandria Democratic Party and I am fully supported by the Democratic team....

(Emphasis added). Indeed, the initial version of this language, also approved by Campbell and mailed to Alexandria voters, was even stronger, proclaiming the candidate a "full member of the Democratic ticket," even though Campbell had been sternly warned that use of the "full member" language would jeopardize his independence and result in Hatch Act prosecution. The change to "fully supported by the Democratic team" was made to express the idea in a way that was, unlike the earlier formulation, at least colorably consistent with the letter of 5 C.F.R. § 733.124(c)(1).

The change was only made after an article appeared in the Washington Post on April 11, 1991, which disclosed that Campbell was under investigation by the Office of Special Counsel for violation of the Hatch Act. The article stated that Campbell had sought and won the Democratic Party endorsement. That article also reported that Campbell had, in a speech asking Democrats to endorse him, said "I have always been a Democrat and I always will be a Democrat." Campbell at his deposition explained that statement in the article as a failure of completeness: His father had told him as a youth that he "was a Democrat, and always will be one." Campbell did not disagree with his father's assessment of his true political persuasion. After Ms. Morris received a copy of the article, she recommended that Campbell delete the reference to "full member."

In addition to actively seeking, arranging for, and advertising the political support of the party, Campbell received significant logistical support as well. He set up his base of operations in party headquarters. His campaign workers used the telephones and other facilities there. Furthermore, the ADC financed and held a campaign kick-off party and other campaign functions for the Democratic nominees and Campbell, and none of the nominees or Campbell paid any share of the event's cost.

Campbell and the five other candidates put forward by the party coalesced into an undifferentiated mass for financial purposes, pooling their funds and paying group rates for expenses such as telephone communications, polling, and even wood stakes for signage. While Campbell and the others eventually reimbursed most of the expenses, Campbell never paid the ADC for use of its facilities for certain events or for the cost of producing and distributing some of his campaign literature. Besides, even with respect to the reimbursed costs, Campbell received, as a matter of economic reality, a subsidy in the form of needed credit and a certain economy of scale (e.g., use of the party's bulk mail permit) he otherwise would not have enjoyed. Finally, on election day, the ADC workers posted the Democratic nominees' and Campbell's posters at the polling places. Campbell's posters did not identify him as an independent.

The CALJ inferred from such facts that Campbell's "intent was to convey the impression that he was shoulder-to-shoulder with his colleagues running under ADC's banner." The full Board agreed. We cannot say that this inference is unreasonable.

## VIII

In short, the record before us contains ample evidence to support a finding

that Campbell was not "independent" of a political party. It is not always sufficient, however, for an appellate court simply to identify a minimum quantum of evidence from which, if credited, the challenged inference reasonably could be drawn. If it appears that the ultimate conclusion is premised to some extent on erroneous or irrelevant subsidiary findings, the reviewer must ask not only whether the agency official *could* have reached the same conclusion absent the impermissible consideration, but also whether the agency official *would* have reached the same conclusion. *See, e.g., National Labor Relations Bd. v. Reed & Prince Mfg. Co.,* 205 F.2d 131, 139 (1st Cir.) (the removal of one of the factual underpinnings of an agency's determination does not warrant remand unless "the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous [subsidiary] ... finding removed from the picture."), *cert. denied,* 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953); *accord Torrington Co. v. United States,* 747 F.Supp. 744, 751 (Ct.Int'l Trade 1990), *aff'd,* 938 F.2d 1278 (Fed.Cir.1991); *see also* 5 U.S.C. § 706 (1988) ("[D]ue account shall be taken of the rule of prejudicial error.").

Campbell observes that the Board mentioned in its analysis two episodes in which third parties publicly proclaimed Campbell a Democrat and Campbell did not seek out and disabuse everyone who had been exposed to the misrepresentation. In the first episode, a supporter by the name of Susan Kellom, who was holding a Campbell campaign event at her home, placed invitations "in the door" of about 250 houses in her neighborhood which read: "Come to my house to meet the Democratic candidate, Lynnwood Campbell." There is no indication in the record that Campbell had any role in arranging for this particular campaign event. Absent any clear factual predicate to associate Ms. Kellom as Campbell's agent, we must assume in Campbell's favor a lack of responsibility for Ms. Kellom's acts.

While Campbell agreed to the holding of this event, and thus should have expected that some sort of invitation would be necessary to announce the event, he did not review the flyer before it went out and learned what it said only after the fact. Campbell told the sixteen in attendance that this was a misstatement but the Board faulted Campbell for "not correct[ing] the error" with the absent invitees by "distribut[ing] notices advising that he was not a Democratic candidate."

In the second episode, ADC workers generated and disseminated a brochure urging voters to support Democratic candidates and listed Campbell among them. The brochure in bold face stated "VOTE DEMOCRATIC" and contained photos and short biographies of the Democratic nominees and Campbell. Campbell was not identified as an "independent." The heading over the individual descriptions read: "These Democrats have demonstrated leadership and earned your confidence." The Board noted that while Campbell had instructed ADC workers to put "independent" by his name on all materials, he had done nothing to correct the misimpression created by the omission.

In this instance, Campbell cannot escape the inference that the ADC workers were on his team, actively working as his agents for his campaign. Neither the CALJ nor the Board expressly found Campbell responsible for acts of the ADC workers as agents, but the emphasis on Campbell's failure to cure the error of the ADC workers supports an inference that those workers were Campbell's agents.

Campbell argues that this evidence is unfairly prejudicial if not logically irrelevant and thus fatally infects the Board's decision. This argument may have merit, but not in this case. Surely the mere fact that a candidate remains silent after learning that a third party has branded him a "Democrat" or a "Republican," without more, has no tendency to prove non-independence. A failure to disclaim just as plausibly could reflect a disinclination to expend limited resources on a wild goose chase as a desire to associate oneself with the remarks.

That is not to say, however, that a failure to disclaim can never be relevant. Indeed, it might be highly probative in certain circumstances—for example, if a candidate inexplicably declines an opportunity to repudiate a suggestion of party affiliation. In that con-

text, passivity could be considered, under familiar principles of evidence, as tantamount to an affirmative declaration of agreement with what was said. So, had Campbell delivered his speech at the Kellom house without pointing out the error in the invitation, the Board reasonably could view the episode as some evidence that he considered himself a party man or at least wanted to create that impression. For another example, suppose the CALJ found, based on substantial evidence, that Ms. Kellom was acting as Campbell's agent and thus had authority to speak for him. Then her statements would be fairly imputable to him, regardless of any subsequent effort to correct the authorized misrepresentation.

But absent a finding of agency, an *inexplicable* failure to disclaim, or some comparable circumstance, the fact that Campbell did less than he conceivably could have done to clear up any misimpression does not rationally support the inference that he approved the third party's characterization. A candidate does not have a categorical duty to clear up misimpressions created by others. To hold otherwise might permit opponents to eliminate a rival by the simple expedient of poisoning the Hatch Act well.

We need not delve more deeply into this, however, for we are fully satisfied that the Board did not rely on the Kellom party episode to a degree that might have affected the outcome. In view of the relatively minor role that event played in the Board's analysis, we harbor no "substantial doubt" that the agency would have drawn the same ultimate inference had the Kellom episode never occurred. Indeed, the evidence in this case is "so one-sided," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986), that any other inference might well be unsupported by substantial evidence.

AFFIRMED.