PUBLIC VERSION

ARISTECH CHEMICAL CORP., BASF CORP., AND STEPAN CO., PLAINTIFFS *v.* UNITED STATES AND U.S. INTERNATIONAL TRADE COMMISSION, DEFENDANTS, AND GRUPO IDESA, S.A., DEFENDANT-INTERVENOR, AND REICHHOLD CHEMICALS, INC., DEFENDANT-INTERVENOR

Court No. 94–01–00032

(Decided March 11, 1996)

*Ablondi, Foster & Sobin, p.c. (F. David Foster, Peter J. Koenig,* and *Lauren D. Frank)* for plaintiffs.
*Lyn M. Schlitt,* General Counsel, United States International Trade Commission; *James A. Toupin,* Deputy General Counsel, United States International Trade Commission *(Robin L. Turner)* for defendant United States International Trade Commission.
*Porter, Wright, Morris & Arthur (Leslie Alan Glick* and *Richard J. Burke)* for defendant-intervenor, Grupo Idesa, S.A.
*Dorsey & Whitney (M. Page Hall, II)* for defendant-intervenor, Reichhold Chemicals, Inc.

OPINION

MUSGRAVE, *Judge:* Plaintiffs Aristech Chemical Corporation, BASF Corporation, and the Stepan Company ("Plaintiffs") contest the preliminary negative injury decision of the U.S. International Trade Commission ("ITC") in *Phthalic Anhydride From Mexico,* Inv. Nos. 701–TA–358 and 731–TA–667 (Preliminary), ITC Pub. 2709 (December 1993); 58 Fed. Reg. 65732 (December 16, 1993). Plaintiffs move pursuant to CIT Rule 56.2 for judgment upon the agency record. The Court has jurisdiction over this matter by way of 28 U.S.C. § 1581(c) (1988).

BACKGROUND

Plaintiffs filed their petition with the ITC and the Department of Commerce on October 22, 1993, alleging that an industry in the United States was materially injured or threatened with material injury by reason of subsidized and less than fair value ("LTFV") imports of phthalic anhydride ("PA") from Mexico, as well as from Brazil, Israel, Venezuela, and by reason of LFTV imports from Hungary. After a 45-day preliminary investigation the ITC determined, by a 4–2 vote, that the United States PA industry was not materially injured or threatened with material injury by reason of Mexican imports. The ITC issued its negative preliminary determination on December 6, 1993, notice of which was published in the Federal Register, 58 Fed. Reg. 65732 (Dec. 16, 1993).

On November 30, 1993, the evening before the ITC voted, and five days before the preliminary negative determination was issued, counsel

for Mexican producer Celanese Mexicana, S.A. ("Celanese") informed the ITC by telephone and by facsimile that Celanese would stop producing PA as of January, 1994. Celanese had previously indicated in a questionnaire response that its Mexican plant might be shut down, but also indicated that if the plant continued to operate, most of its exports would be directed to the United States. Admin. R., List No. 2, Doc. No. 31.29, Celanese Resp. at 5. The facsimile was not certified as accurate and complete to the best of the submitter's knowledge, nor were any of the other parties to the investigation served with a copy of the facsimile. Notwithstanding, the ITC staff apparently found the assertion of significance and pursued the matter. ITC staff contacted a major importer, which, the ITC says, confirmed that the Mexican plant would be closing. The ITC relied upon this information in reaching the 4–2 negative injury or threat of injury determination as a result of imports of PA from Mexico. *See, e.g.*, Admin. R., List No. 1, Doc. No. 96 at I–36.

## Standard of Review

By statute, this Court shall hold unlawful any determination, finding, or conclusion of the ITC found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(A) (1988). Accordingly, the Court is to review the record for the relevant factors and consider whether there has been a clear error of judgment on the part of the ITC. The Court will not disturb the ITC determination so long as a rational basis exists for the choices made by the ITC. *Bowman Transportation, Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (quoting *Burlington Truck Lines v. United States*, 371, U.S. 156, 168 (1962)); *Connecticut Steel Corp. v. United States*, 18 CIT 313, 315, 852 F. Supp. 1061, 1064 (1994). Furthermore, decisions of the ITC are presumed to be correct. The burden of proving otherwise shall rest upon the party challenging such decisions. 28 U.S.C. § 2639(a)(1) (1988).

The ITC is charged with determining, based upon the best information available to it at the time of the determination, whether there is a reasonable indication that an industry is materially injured or threatened with material injury. 19 U.S.C. §§ 1671b(a)(1), 1673b(a)(1) (1988). A negative preliminary determination by the ITC of a reasonable indication of material injury or threat of material injury is permissible when (1) the record as a whole contains clear and convincing evidence that there is no material injury or threat of such injury; and (2) no likelihood exists that contrary evidence will arise in a final investigation. *American Lamb Co. v. United States,* 785 F.2d 994, 1001 (Fed. Cir. 1986).

## Discussion

While plaintiffs raise several points they consider to be errors on the part of the ITC, their most serious challenge seems to be that the ITC accepted and relied upon last minute information that a major producer of PA in Mexico had ceased production and closed its Mexican facility. Plaintiffs point out that this data was not open to rebuttal, was not certi-

fied, and was not received in time to be properly assessed, and further that the plant could later be re-opened, other Mexican producers could purchase the closed facility's equipment; thus plaintiffs reason, the ITC improperly relied on the notice received by them of the plant closing in its negative determination of threat of material injury by reason of imports of PA from Mexico.

Plaintiffs' concerns are not without merit, and were the matter before the Court *de novo*, a position different from that of the ITC might well have obtained. But that is not the posture in which the case rests. Congress intended application of a narrow judicial review standard. *American Lamb Co. v. United States*, at 1004. The statute, 19 U.S.C. § 1516a(b)(1)(A), provides that the Court shall overturn the determination, finding, or conclusion of the ITC if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." "If ITC's negative determination cannot be held defective on any of these grounds the court should not overturn it." *American Lamb,* 785 F.2d at 1004. The Court finds that the instant determination cannot be found defective on any of these grounds and therefore affirms it.

The record in this case reflects that the possibility of the Celanese plant closure was before the ITC during its investigation. And the plant was a significant factor in the production of PA in Mexico and its exportation to the US, accounting for [  ] percent capacity and [  ] percent of production. Admin. R., List No. 2, Doc. No. 26. When the ITC was advised of the closure, its consideration of that fact in reaching its negative determinations cannot be said to have been arbitrary and capricious, notwithstanding that one could have wished for a more thorough and public airing of the data. Even though the data was received by the ITC at the "eleventh hour," none of the parties to this action contest the veracity or accuracy of the report, but only the lack of opportunity to comment before the preliminary determination was reached. The ITC staff did make enquiry, and the transcript of the meeting at which the determination was reached reflects that the staff was advised that the closing seemed to be a matter of public knowledge. Admin. R., List No. 1, Doc. No. 78 at 5.

Given the time constraint under which the ITC labors to reach its preliminary determination, it was not capricious nor arbitrary to consider the new, important information concerning the plant closing. It is bound to consider *all* information relating to the subject before it, and it was within the ITC's discretion to reach a preliminary negative determination based on the information before it, rather than speculating on plant re-openings, or other future possibilities, and rather than reaching a tenuous affirmative finding—which apparently the majority could not have done in good faith—or going to a final determination, which the majority obviously did not feel was justified.

Plaintiffs also raise concerns over the production capacity and capacity utilization data relied upon by the ITC. Plaintiffs point out that the figures relied upon by the ITC and Vice Chairman Watson erroneously

included certain production figures of Mexican producer Sintesis in determining the capacity utilization rate for Mexican producers. Plaintiffs further claim that Vice Chairman Watson improperly concluded that Mexican producers can increase their capacity utilization by adding extra shifts. In addition, plaintiffs argue that the capacity utilization figures used by the ITC are contrary to the figures reported by other sources such as the Mexican government, the Mexican and Latin American chemical trade association, and independent industry experts. Plaintiffs claim these figures are the best information available which the ITC is required to use by law.

As to the latter of these concerns, the record reflects that the government, trade association, and industry data was before the ITC, which, "absent some showing to the contrary, * * * is presumed to have considered all evidence in the record" in making its determination. *Connecticut Steel,* 18 CIT at 316, 852 F. Supp. at 1065, (citing *Rhône Poulenc, S.A. v. United States,* 8 CIT 47, 55, 592 F. Supp. 1318, 1326 (1984)); *Torrington Co. v. United States,* 16 CIT 220, 224, 790 F. Supp 1161, 1167, *aff'd,* 991 F.2d 809 (Fed. Cir. 1993). The ITC is granted discretion in deciding which information is the best available for making its determination. *American Lamb,* 785 F.2d at 1003–1004. The Court is satisfied that the ITC has conducted its investigation consistent with its statutory mandate as set forth in 19 U.S.C. § 1677e(c) (1988). The Court therefore finds that the ITC's use of data other than that urged by plaintiffs was a reasonable exercise of its discretion under the statute.

Regarding the capacity utilization data erroneously calculated and the conclusions drawn from that data, the question for the Court is whether the ITC would have come to a different conclusion had the capacity utilization rate not been overstated. While the Court is not permitted to substitute its judgment for that of the ITC, *Bowman,* 419 U.S. at 285–86, (citing *SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)),* the Court also should not remand the preliminary determination unless it is in substantial doubt as to whether the ITC would reach the same conclusion. *See Lynnwood Campbell v. Merit Systems Protection Bd.,* 27 F.3d 1560, 1570 (Fed Cir. 1994), (citing *NLRB v. Reed & Prince Mfg. Co.,* 205 F.2d 131, 139 (1st Cir. 1953)). Indeed this Court in the past has affirmed ITC determinations which were based in part upon erroneous information. *See Bando Chemical Industries, Ltd. v. United States,* 17 CIT 798, 807 (1993); *Torrington Co. v. United States,* 14 CIT 648, 654, 747 F. Supp 744, 751 (1990), *aff'd,* 938 F.2d 1278 (Fed Cir. 1991); *and Roses Inc. v. United States,* 13 CIT 662, 668–69, 720 F. Supp. 180, 185 (1989). Although the information relied upon in the given case was erroneous, there is information in the record which nonetheless supports the ITC's conclusion regarding capacity utilization rates. For example, Celanese's representative testified at the ITC conference that "Mexican industry is operating at a high capacity utilization level, averaging [   ] percent in 1992, indicating very little room for growth." Admin R., List No. 1, Pub. Doc. No. 45 at 75. Furthermore, the corrected data reveals capacity uti-

lization rates in the range of [74–92] percent. Pls.' Br. at 11a. The Court is not, therefore, in substantial doubt as to whether the ITC would have reached the same conclusion, and accordingly finds that the ITC and Vice Chairman Watson had a rational basis for their conclusions regarding capacity utilization.

Plaintiffs assert that there is no factual basis in the record for Vice Chairman Watson's conclusion that the plant closure would affect exports to the U.S., either by causing such exports to decline, or to increase insignificantly. Pls.' Br. at 14–15.

Subsection 1677(F)(i)(III) requires the ITC to consider "any rapid increase in United States market penetration and the likelihood that the penetration will increase to an injurious level." In analyzing subsection 1677(F)(i)(III), Vice Chairman Watson relied upon at least two facts in concluding that it is not likely that imports will increase to an injurious level. He pointed to the imminent Celanese plant closure, and further pointed out that although market share had increased throughout the period of investigation, Mexican producers' market share never exceeded [   ] percent of apparent U.S. consumption. Admin. R., List No. 1, Doc. No. 96 at I–36. Although such data is subject to interpretation, when imports in both the past and present do not amount to material injury despite significantly greater production capacity than will exist in the future, such a conclusion is rationally supported. Accordingly, the Court finds that the information Vice Chairman Watson relied upon rationally serves as a basis for both his conclusion that there is no likelihood that penetration will increase to an injurious level.

Plaintiffs argue that Vice Chairman Watson failed to consider the [   ] demand for Mexican PA shipments in markets other than the U.S., and a corresponding [   ] of imports into the U.S., and that failure to consider this "relevant" factor amounts to an unlawful abuse of discretion and is not in accordance with the statutory requirement of using best information available. Pls.' Br. at 16.

Section 1677(F)(i)(VII) requires the ITC to consider "any other demonstrable adverse trends that indicate the probability that the importation * * * will be the cause of actual injury." Plaintiffs argue that "[n]o reasoning can be discerned by which this trend would not be considered an adverse trend. The only possible conclusion is that this adverse trend was not considered." Pls. Br. at 16. Although plaintiffs' assessment may be correct inasmuch as this information could be construed as an adverse trend, it is clear that plaintiffs' argument fails to consider an essential corresponding portion of the statute: that such adverse trend indicates the probability that importation will be the cause of actual injury. As previously discussed, the ITC is presumed to have considered all of the record before it, absent a showing to the contrary. Furthermore, the ITC's path need only reasonably be discerned. *Bowman,* 419 U.S. at 286, (citing *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 595 1945). Vice Chairman Watson concluded that "[t]here are no 'other demonstrable adverse trends' that indicate that imports will

be the cause of actual injury." Admin. R., List No. 1, Doc. No. 96 at I–36. He thus considered the requirement of cause of actual injury, although not the probability of such. Nonetheless, his path is reasonably discernible from previously discussed facts, not the least of which is the Celanese plant closure. Accordingly, Vice Chairman Watson's immediate conclusion regarding adverse trends has a rational basis in the record.

For the above reasons, plaintiffs' remaining arguments concerning certain "other" factors set forth in their brief at 16–19, are without merit.

### CONCLUSION

The ITC preliminary negative determination in the above matter was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. Therefore, this preliminary determination is affirmed.