# United States Court of Appeals for the Federal Circuit

04-3066

MIKE MCENTEE,

Petitioner,

v.

MERIT SYSTEMS PROTECTION BOARD,

Respondent.

Patrick J. Rogers, Modrall, Sperling, Roehl, Harris & Sisk, P.A., of Albuquerque, New Mexico, argued for petitioner.

Joyce G. Friedman, Attorney, Office of the General Counsel, United States Merit Systems Protection Board, of Washington, DC, argued for respondent. With her on the brief were Martha B. Schneider, General Counsel and Stephanie M. Conley, Reviewing Attorney.

Appealed from: United States Merit Systems Protection Board

# United States Court of Appeals for the Federal Circuit

04-3066

MIKE MCENTEE,

Petitioner,

v.

MERIT SYSTEMS PROTECTION BOARD,

Respondent.

_____

DECIDED:  April 15, 2005

_____

Before GAJARSA, Circuit Judge, PLAGER, Senior Circuit Judge, and LINN, Circuit Judge.

GAJARSA, Circuit Judge.

Mike McEntee appeals from a decision by the Merit Systems Protection Board (the "Board" or "MSPB") granting summary judgment that he had committed violations of the Hatch Act in the conduct of his campaign for Mayor of Albuquerque, New Mexico. Special Counsel v. McEntee, CB-1216-02-0007-T-1 (MSPB Sept. 8, 2003).  The Hatch Act[1] is the colloquial designation for the federal statute that prohibits covered government employees from engaging in certain partisan political activities.  See

---

[1]     The name "Hatch Act" initially referred to Senate Bill 1871 introduced by Senator Carl Hatch, enacted as chapter 410, 53 Stat. 1147 (1939) and originally codified as 18 U.S.C. § 61.  As used here, the terms "Hatch Act" or "Act" refer not to a particular bill, but to the body of federal statutes and regulations restricting the political activities of federal employees.

generally 5 U.S.C. §§ 7321-7326 (2000). Because we discern no legal error in the Board's decision and it was supported by substantial evidence, we affirm.

## I.     BACKGROUND

In August 2001, McEntee declared himself a candidate for Mayor of Albuquerque, New Mexico. According to city ordinances, the mayoral race is intended to be nonpartisan and the names of the candidates are listed on the ballot without party or other designation. At the time he became a candidate, McEntee was employed as an air traffic control specialist with the Federal Aviation Administration ("FAA"), a position he obtained in 1982. Prior to declaring his candidacy, McEntee consulted with the Albuquerque FAA Ethics Counselor regarding restrictions imposed by the Hatch Act. When asked prior to the onset of the campaign, both the Albuquerque FAA Ethics Counselor and FAA's regional counsel determined that the Hatch Act did not prevent McEntee from being a candidate.

In support of McEntee's quest for the mayoral seat, his campaign distributed a variety of leaflets and other literature. A campaign checking account was established under the name "Friends for Mike McEntee," which paid for the printing and distribution costs of those materials. McEntee approved for distribution all of the campaign literature at issue.

The McEntee campaign distributed leaflets stating "Mike McEntee – the **ONLY CONSERVATIVE REPUBLICAN** in the race for Mayor."[2] The same leaflet included the statement "**[f]inally, Republicans have a chance to elect a Conservative to lead our**

---

[2]     All of the emphasis that appears in the cited quotations from McEntee's campaign literature is original.

**city**" and the following quote from "Former Republican State Representative Frank Bird:"

> For years Republicans have been forced to hold their nose and accept the policies that city government forced on them by Jim Baca, Marty Chavez and the rest of the liberal Democrats. Now, for the first time in years we have a chance to elect one of us, a conservative Republican to clean up the mess in City Hall.

Two additional leaflets also described McEntee as "The **<u>ONLY</u>** Conservative Republican!"

The campaign also distributed a "Dear Friend" letter from Jack Stahl, "Former Republican Lieutenant Governor," which included the following statements:

> **In two months, we can FINALLY elect a REPUBLICAN MAYOR to lead this city!**
>
> As Republicans, we know that this is the first time in years – and probably the last time in even more years – that we have a chance to elect a Republican Mayor to bring conservative values and principles to City Hall.
>
> IF REPUBLICANS UNITE BEHIND THE ONLY CONSERVATIVE REPUBLICAN, MIKE McENTEE . . . . . . . . . WE WIN!
>
> We Republicans can turn Albuquerque into a great city, but we need your help twice. First; WE NEED YOUR VOTE, Second; <u>We need your financial support now so Mike McEntee can put his **Conservative Republican** message in the mail, on TV and on radio.</u>
>
> Our city is crying out for new REPUBLICAN leadership.
>
> **WE REPUBLICANS CAN MAKE A DIFFERENCE!**

The letter further listed McEntee's opponents, all identified as "<u>Democrat</u>."

McEntee's campaign also disseminated a "Dear Republican Friend" letter that stated:

> One reason I am writing you is because you are a registered Republican. . . . This is not supposed to be a "partisan" election, but we all know Mayor Baca and former Mayor Marty Chavez are cut from the same mold!

> As Republicans, we are outnumbered in Albuquerque. Our only hope of defeating the Democrat machine is to stick together behind one candidate. At last count there were at least 10 candidates saying they were running for Mayor, most of them Democrats like Baca and Chavez.

Another leaflet invited Albuquerque's kids to "[t]ake a shot at wasted spending at our Dunk the Dems tank," as part of an event sponsored by the McEntee campaign.

The McEntee campaign also issued press advisories, one of which announced that "Former Congressman Bill Redmond joined with 10 Republican legislators and grassroots Republican leaders to announce their endorsement of Republican candidate for Mayor, Mike McEntee, at a press conference on Wednesday, August 22, 2001." McEntee was present at the referenced press conference. The same press advisory included this quote from Senator Mark Boitano: "Republicans need to stand behind the candidate who will stand for the values that Republicans hold dear."

In addition to the endorsements of individual Republicans, McEntee also received endorsements from the Executive Committee of the Bernalillo County Republican Party, the Republican Assembly and the Republican Lincoln Caucus. McEntee trumpeted these endorsements in the press advisory discussed above.

The McEntee campaign solicited campaign contributions in a variety of ways. The "Dear Friend" letter from "Former Republican Lieutenant Governor" Jack Stahl included the statements "**I'VE JUST SENT MY CHECK TO MIKE MCENTEE. WON'T YOU PLEASE SEND YOUR CHECK TODAY?** . . . You [sic] contribution of $25, $50, $100 or even $1000 is vital. Please let us know in the next 10 days if you can help elect the only conservative candidate." Similarly, the Dear Republican Friend told recipients that "[i]f you can afford a small contribution to help us offset the cost of this mailing and to help us build a warchest for the battle with Baca and Chavez down the road, we

04-3066                                            4

would appreciate it."  Other campaign literature also included solicitations as did the campaign website.  At least two fundraising events were held in support of the McEntee campaign, one on June 21, 2001, and another on September 14, 2001.

The local press reported on the Republican partisanship of the McEntee campaign.  An article in the Albuquerque Journal chronicled McEntee's endorsement by the Bernalillo County Republican Executive Committee under the headline "County GOP Back McEntee for Mayor."  A similar article in the Albuquerque Tribune, dated August 23, 2001, was entitled "Party Time? Open Republican endorsement stirs up supposedly nonpartisan election."  The "Party Time" article included statements from the State Republican Party Chairman indicating that "the county GOP's actions take the 'cloak off' claims that party politics don't control city government."  The article included the observation that "McEntee, whose campaign has struggled to catch fire, is eagerly wrapping himself in the Republican flag."  Finally, another article in the Albuquerque Journal, entitled "GOP Radar Focuses on McEntee," stated that "[a]s the sun set on his fundraiser, McEntee stepped to the microphone and stayed true to form.  His message was simple:  We need a Republican on the 11th floor."  The McEntee campaign responded to the press coverage in part by circulating an editorial under McEntee's name stating that "[t]he Journal is irate because I believe in the conservative values embraced by Republicans and am open and honest enough to proudly call myself a Republican."  At no time during the campaign did McEntee disavow his Republican identity or refute or refuse the assistance, financial or otherwise, of the Republican Party structure.

On August 30, 2001, Amber Bell, an attorney with the Office of Special Counsel ("OSC"), informed McEntee that the OSC believed that his candidacy for Mayor violated the Hatch Act. Bell offered McEntee the option of resigning his candidacy or resigning his federal position. McEntee answered that he did not believe his candidacy was unlawful. In a letter dated August 31, 2001, William Reukauf, Associate Special Counsel with the OSC, reiterated the message of Bell's conversation and notified McEntee that partisan politics had entered his campaign and therefore his candidacy for Mayor of Albuquerque violated the Hatch Act. Specifically, Reukauf determined that the presumption that the Albuquerque Mayoral election is nonpartisan was rebutted by McEntee's endorsement by the "Bernalillo County Republican Party" and his advertisement of that endorsement. Reukauf's letter permitted McEntee to correct his violation by either publicly withdrawing from the election or resigning his federal position by September 7, 2001.

McEntee, through counsel, responded in writing to Reukauf's letter. McEntee's response challenged Reukauf's statement that McEntee had been endorsed by the Bernalillo County Republican Party on the grounds that McEntee was endorsed only by a small committee of Republicans, which did not have the authority to issue an endorsement on behalf of the entire party. McEntee asserted that because he had not received the endorsement of a state or national political party the election had not been transformed into a partisan political race. McEntee chose not to withdraw from the race and did not resign his position with the FAA. The election was held October 2, 2001 and McEntee was not elected.

On November 20, 2001, OSC filed a complaint with the Merit Systems Protection Board charging McEntee with being a candidate for election to partisan political office in violation of § 7323(a)(3) of the Hatch Act and its implementing regulations. See 5 U.S.C. § 7323(a)(3) (2000); 5 C.F.R. § 734.304 (2004). The OSC also charged McEntee with knowingly soliciting, accepting, or receiving political contributions in violation of § 7323(a)(2) of the Hatch Act and its implementing regulations. See 5 U.S.C. § 7323(a)(2) (2000); 5 C.F.R. § 734.303 (2004). As a penalty for his violations, OSC asked that McEntee be removed from his position with the FAA.

The parties agreed to bifurcate the proceedings into liability and penalty determinations. In its Order Granting Summary Judgment, the Board determined that party politics had entered the presumptively nonpartisan election for Mayor of Albuquerque and that McEntee's activities in that election violated the Hatch Act as alleged. In a separate Recommended Decision, the Board determined that the appropriate penalty for McEntee's violations was that he be suspended from his position with the FAA for a period of 120 days.

McEntee filed a timely appeal challenging only the Board's decision that he had committed violations of the Hatch Act. This court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(9).

## II.   DISCUSSION

The scope of our review in an appeal from a decision of the Board is limited. The Board's decision must be affirmed unless it was: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by

substantial evidence." 5 U.S.C. § 7703(c) (2000); Briggs v. Merit Sys. Prot. Bd., 331 F.3d 1307, 1311 (Fed. Cir. 2003). McEntee alleges that the Board's decision is not in accordance with law because it does not comport with the current provisions of the Hatch Act. He also alleges that the decision is not supported by substantial evidence. We review the Board's determinations of law for correctness without deference to the Board's decision. King v. Dep't of Navy, 130 F.3d 1031, 1033 (Fed. Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).

The Board found that McEntee had engaged in two forms of conduct prohibited by the Hatch Act: 1) running as a candidate for election to a partisan political office in violation of 5 U.S.C. § 7323(a)(3); and 2) knowingly soliciting and receiving a political contribution in violation of 5 U.S.C. § 7323(a)(2). The Board grounded its findings for both violations in its determination that the McEntee campaign introduced partisan politics to the 2001 Albuquerque Mayoral election, effectively rebutting the presumption that the race was not an election for partisan political office.

The longstanding policy of the administrative agencies tasked with enforcing the Hatch Act has been to presume that participation in an election for which state law provides for a nonpartisan ballot is not a prohibited activity. In re Broering, 1 P.A.R. 778, 779 (CSC 1955); see also Special Counsel v. Mahnke, 54 M.S.P.R. 13 (1992); Special Counsel v. Seastrunk, 28 M.S.P.R. 51 (1985); Special Counsel v. Yoho, 15 M.S.P.R. 409 (1983). Under the precedent of the MSPB, the presumption that an election is nonpartisan could be rebutted by evidence showing that partisan politics

actually entered the campaigns of the candidates. Broering, 1 P.A.R. at 779 (presumption that election was nonpartisan rebutted by evidence that respondent readily accepted partisan political support, knew that he was being supported by a partisan political party, and passed out literature indicating that he had the support of a partisan political party); Mahnke, 54 M.S.P.R. at 13 (presumption of nonpartisanship was rebutted by appearance of opponent's party designation on the ballot); Seastrunk, 28 M.S.P.R. at 51 (presumption of nonpartisanship was rebutted because two candidates opposing respondent appeared as Democrats on the ballot); Yoho, 15 M.S.P.R. at 409 (although Democratic and Republican parties remained neutral as to all of the candidates, presumption of nonpartisanship was rebutted when two of the candidates appeared on the ballot with party designations).

In its initial charges against McEntee, the OSC described this process of rebutting the presumption of nonpartisanship as "transforming" the presumptively nonpartisan election into a prohibited contest. McEntee has seized on the OSC's use of the word "transform" and characterizes the rationale articulated by Broering as a "transformation theory," whereby an election in which federal employees are guaranteed the right to participate is changed into a partisan political race. We address below McEntee's assertions regarding the rights afforded federal employees under the Hatch Act, but we note at the outset that "transformation theory" does not accurately describe the way in which the Hatch Act is enforced. The rationale articulated in Broering and its progeny does not operate to "transform" a protected activity into a prohibited activity, but rather it allows for the presumption of nonpartisanship created by state and local election laws to be rebutted by the actual conduct of an election. Here,

04-3066                                  9

Albuquerque city ordinances provide that candidates for mayor shall be listed on the ballot without party or other designation. Accordingly, the Board presumed that the 2001 mayoral election qualified as a nonpartisan election in which McEntee could participate without violating the Hatch Act. The Board determined that the presumption of nonpartisanship was rebutted by overwhelming evidence showing that McEntee's campaign had injected partisan politics into the race.

McEntee alleges that the Board's reliance on evidence of the actual conduct of the election to rebut the presumption of nonpartisanship was improper in light of the passage of the Hatch Act Reform Amendments of 1993, Pub. L. No. 103-94, 107 Stat. 1001 (the "1993 Amendments"). He also charges that the so-called "transformation theory" is unconstitutional because it violates the First Amendment. Finally, McEntee asserts that the Board's determination that the 2001 Albuquerque mayoral race constituted a partisan election was not supported by substantial evidence.

A. The Statutory Language

In order to understand the effect of the 1993 Amendments, it is necessary to first understand the context in which they were adopted. The Hatch Act was initially enacted in 1939 in response to concerns about the harmful effects of political activities by government workers. The Act drew on rules promulgated by the Civil Service Commission that were designed to prevent merit system employees from "using [their] official authority or influence either to coerce the political action of any person or body or to interfere with any election." S. Rep. 103-57 at 2, reprinted in 1993 U.S.C.C.A.N. 1802, 1803 (1993); see also United States Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, 413 U.S. 548, 560 (1973).

The pre-1993 Hatch Act broadly limited the ability of federal employees to engage in certain political activities by prohibiting employees subject to the structure of the Act from taking "an active part in political management or in political campaigns." 5 U.S.C. § 7324(a)(2) (1988). The term "an active part in political management or in political campaigns" was defined in the statute as "those acts of political management or political campaigning which were prohibited on the part of employees in the competitive service before July 19, 1940, by determinations of the Civil Service Commission under the rules prescribed by the President." Id.

In the process of upholding the constitutionality of the pre-1993 statute, the Supreme Court limited its reach to the specific prohibitions set out in the regulations promulgated by the Civil Service Commission in 1970. Letter Carriers, 413 U.S. at 576. At the time Letter Carriers was decided and until the passage of the 1993 statutory amendments, the pertinent regulations provided that:

(a)     An employee may not take an active part in political management or in a political campaign, except as permitted by this subpart.

(b)     Activities prohibited by paragraph (a) of this section include but are not limited to . . . [b]ecoming a partisan candidate for, or campaigning for, an elective public office.

5 C.F.R. § 733.122 (1970). Thus, the interplay of the statute, regulations, and case law established a broad prohibition against covered employees playing an active role in political campaigns, which included a ban on becoming a partisan candidate for public office.

The primary text of the Act remained in its original form until the passage of the 1993 Amendments. The post-1993 Hatch Act expressly prohibits covered employees from running "for the nomination or as a candidate for election to a partisan political

office." 5 U.S.C. § 7323(a)(3). Furthermore, covered employees may not "knowingly solicit, accept or receive a political contribution from any person," subject to certain exceptions not applicable here. Id. § 7323(a)(2). The statutory definition of a "political contribution" includes "any gift subscription, loan advance or deposit of money or anything of value, made for any political purpose." Id. § 7322(3)(A). The relevant regulations define a "political purpose" as "an objective of promoting or opposing a political party, candidate for partisan political office, or partisan political group." 5 C.F.R. § 734.101 (2004).

The key language in the current statutory structure, as applied by the Board, is the term "partisan political office." The statute defines a "partisan political office" as "any office for which any candidate is nominated or elected as representing a party any of whose candidates for Presidential elector received votes in the last preceding election at which Presidential electors were selected." 5 U.S.C. § 7322(2) (2000).[3]

In addition to changing the language and substance of the prohibition effected by the Act, the 1993 Amendments added a policy statement to the statute. Section 7321 of the current Hatch Act reads: "It is the policy of the Congress that employees should be encouraged to exercise fully, freely, and without fear of penalty or reprisal, and to the extent not expressly prohibited by law, their right to participate or to refrain from participating in the political processes of the Nation." 5 U.S.C. § 7321 (2000).

The legislative history provides further guidance on the purpose of the 1993 Amendments. The Senate Report issued in conjunction with Senate Bill 185, the bill

_____

[3] For ease of reference, in the remainder of the opinion we use the shorthand term "major political party" in place of the statutory language "a party any of whose candidates for Presidential elector received votes in the last preceding election at which Presidential electors were selected."

introducing the 1993 Amendments, questioned the efficacy of the original Act's broad ban on employee partisan political activity and identified two remediable concerns: (1) "the neutrality requirement . . . inhibits Federal employees from exercising their constitutional rights;" and (2) the statute and enforcement scheme are vague "resulting in an inability to ascertain the precise extent of prohibited and protected activities or the penalties involved." S. Rep. No. 103-57 at 5, reprinted in 1993 U.S.C.C.A.N. at 1806 (1993).

In order to address the concerns identified, the 1993 Amendments relaxed the prohibitions of the Hatch Act "to provide for Federal civilian employees to participate voluntarily, as private citizens, in the political processes of the Nation and to protect such employees and the General citizenry from improper political solicitations." S. Rep. No. 103-57 at 1, reprinted in 1993 U.S.C.C.A.N. at 1802. As expressly stated in the Senate Report to Senate Bill 185, the amendments were designed to restore to most federal employees the right, while off-the-job, to "take an active part in political management or in political campaigns," while maintaining and strengthening prohibitions on "political activity" while at work. Id. at 1803. The amendments also continued "current law prohibitions against running for partisan elective office and against solicitation of potential contributions from the general public." Id. In responding to Minority Views issued by opponents to Senate Bill 185, the bill's sponsor, Senator John Glenn, reiterated that, contrary to prior attempts to reform the Hatch Act, his bill did not relax the law prohibiting federal employees from running for partisan elective office. Id. at 1838. The explicitly identified purpose of Senate Bill 185 and the statements of the bill's drafter and chief proponent indicate that the changes wrought by

the 1993 Amendments were not intended to alter the original Act's restrictions on the ability of employees to serve as candidates in partisan elections. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 203 (1976) (giving weight to the explanatory statements made by a spokesman for the drafters of a statute).

B.  The Viability of the Rebuttable Presumption Analysis

McEntee argues that the application of a rebuttable presumption of nonpartisanship is no longer a viable construct because: (1) the definition of "partisan political office" excludes elections designated as nonpartisan under state or local law; and (2) the policy statement of § 7321 protects the right of federal employees to participate in such elections. McEntee's interpretation of the statute is without merit.

McEntee asserts that elections designated as nonpartisan under state or local law cannot meet the statutory requirements to be considered a "partisan political office." To reach this conclusion, McEntee reads the language of § 7322(2) as requiring that a candidate be elected or nominated to represent a major political party. Under this theory, because elections designated as nonpartisan do not provide a mechanism for parties to choose or identify their representative candidates, participation in such elections cannot constitute running for a "partisan political office."

We reject McEntee's reading of § 7322(2) on the ground that it is contrary to the plain meaning of the statutory language. Statutory interpretation begins with the language of the statute, the plain meaning of which we derive from its text and its structure. Norfolk Dredging Co., Inc. v. United States, 375 F.3d 1106, 1110 (Fed. Cir. 2004). Here, McEntee presumes that the term "nominated or elected" modifies the phrase "as representing a party" thereby creating a requirement that the candidates

represent a party by nomination or election. A careful reading of the statute, however, reveals that the phrase "as representing a party" actually modifies the term "nominated or elected" and the entire clause "any candidate is nominated or elected as representing a party" identifies the office sought. Accordingly, the definition of a "partisan political office" expressly encompasses offices for which candidates are either nominated as representing a party or elected as representing a party.

While the term "nominated . . . as representing" a party suggests a formal party endorsement or selection process, the term "elected as representing a party" is broader and imposes no such implication. In order to give meaning to all the words of the statute, as we must, we do not read the term "elected as representing a party" to require formal endorsement or selection by a major political party. TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (stating that cardinal principles of statutory construction require that statutes be construed so that "no clause, sentence or word shall be superfluous, void, or insignificant" (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001))); United States v. Menasche, 348 U.S. 528, 538-39 (1955) ("It is our duty to give effect if possible, to every clause and word of a statute." (internal cites omitted)); Shoshone Indian Tribe of the Wind River Reservation v. United States, 364 F.3d 1339, 1349 (Fed. Cir. 2004) ("Accepted rules of statutory construction suggest that we should attribute meaning to all of the words in the Act if possible."); James v. Santella, 328 F.3d 1374, 1381 (Fed. Cir. 2003) (stating that as a general rule a statute should not be construed in such a way that renders one of its parts inoperative). Thus, the terms of § 7322(2) do not preclude an election designated as nonpartisan under state law from constituting an election for a "partisan political office."

McEntee also asserts that the demise of the rebuttability of the presumption of nonpartisanship is mandated by § 7321. He reads the policy statement articulated in that section to prevent OSC from challenging the participation of federal employees in elections designated as nonpartisan under state or local law. He also contends that the section requires that all activities encompassed by the prohibitions of the Hatch Act be directly addressed in the statute thereby disallowing the application of the judicially-constructed rebuttable presumption analysis.

McEntee's interpretation of § 7321 does not accurately reflect the changes in the statutory scheme effected by the 1993 Amendments. Section 7321 states that "employees should be encouraged to exercise fully, freely, and without fear of penalty or reprisal, and to the extent not expressly prohibited by law, their right to participate or to refrain from participating in the political processes of the Nation." 5 U.S.C. § 7321 (2000). The 1993 addition of § 7321 simply raised what had previously been the articulated policy of the Office of Personnel Management to the level of statute.

Prior to the 1993 Amendments, the regulations implementing the Hatch Act included the statement that "[a]ll employees are free to engage in political activity to the widest extent consistent with the restrictions imposed by law and this subpart." 5 C.F.R. § 733.111(a) (1992). The regulations went on to identify the activities expressly permitted by the Act to include taking "an active part, as a candidate or in support of a candidate, in a nonpartisan election." Id. § 733.111(a)(10). According to the pre-amendment statutory definition of "nonpartisan political activity," employees were not prohibited from engaging in "political activity in connection with . . . an election and the preceding campaign if none of the candidates is to be nominated or elected at that

election as representing a party any of whose candidates for presidential elector received votes in the last preceding election at which presidential electors were selected."  5 U.S.C. § 7326(1) (1988).  It is worth noting that the earlier definition of "nonpartisan political activity," where no candidate could be nominated or elected as representing a major political party, is simply the converse of the definition in the current statute for "partisan political office," which includes elections where any candidate is nominated or elected as representing a major political party.   Furthermore, the current regulations continue to define "nonpartisan election" in the exact terms used in the pre-1993 statute.  See 5 C.F.R. § 734.101 (2004).

Placing the 1993 Amendments in their full legislative context, it is clear that, contrary to McEntee's assertion, the incorporation of § 7321 did not enhance the protection afforded an employee's right to participate in a presumptively nonpartisan election.  Such rights were expressly protected under the pre-1993 regulatory scheme and the policy language of § 7321 simply reinforces that employees retain all political rights not expressly prohibited.

McEntee also argues that the phrase "not expressly prohibited by law" found in § 7321 requires that all limitations imposed on employees' political rights be promulgated in the statute.  In support of this theory, McEntee attempts to rely on the legislative history of the amended statute and the regulations implementing it.

The Senate Report issued in conjunction with the reporting of Senate Bill 185 included additional views from four senators opposing the bill as written.  As cited by McEntee, those senators stated that they read the language of what is now § 7321 "to state clearly and unequivocally that without an express prohibition stated in statute, the

President or agency will lack the necessary authority to provide for additional prohibitions beyond S. 185." S. Rep. No. 103-57 at 41, reprinted in 1993 U.S.C.C.A.N. at 1842. This statement was specifically made not out of concern over the scope of the activities prohibited, but in an effort to exempt certain "sensitive" employees, such as "career senior executive service employees, federal supervisors and managers, and employees of comparable rank and status, from coverage under the bill." Id. The amendment that was proposed to address the concerns expressed in the additional views was disapproved by voice vote. S. Rep. No. 103-57 at 9, reprinted in 1993 U.S.C.C.A.N. at 1810. McEntee provides no rationale as to why we should give weight to an interpretation of the statute offered by senators opposing the bill adopted. As the Supreme Court has stated, "the fears and doubts of the opposition are no authoritative guide to the construction of legislation," Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394 (1951), because often "[i]n their zeal to defeat a bill, they understandably tend to overstate its reach." NLRB v. Fruit Packers, 377 U.S. 58, 66 (1964); see also Bryan v. United States, 524 U.S. 184, 196 (1998). The relevance of the interpretation cited here is further diminished by the recognition that it was offered in response to concerns other than those identified by McEntee and the amendment proposed to address those concerns was rejected. We do not find the cited legislative history persuasive authority for interpreting § 7321 to prohibit application of the rebuttable presumption analysis.

McEntee's reliance on 5 C.F.R. § 734.104 is equally unavailing. The cited regulation provides that "[n]o further proscriptions or restrictions may be imposed upon employees covered under this regulation" with certain exceptions not relevant here.

5 C.F.R. § 734.104. The rebuttable presumption analysis, however, does not impose an additional proscription or restriction on federal employees. To the contrary, it simply permits enforcing officials to consider the actual conduct of a presumptively nonpartisan election in determining whether any federal employee candidate stood for election in that race "as representing a party."[4] Such an inquiry does not conflict with the provisions of 5 C.F.R. § 734.104, which restricts the government's ability to make illegal activities deemed lawful under the statute and regulations, but does not limit the government's inquiry into determining what constitutes an unlawful activity.

McEntee correctly asserts that the 1993 Amendments relaxed the scope of certain Hatch Act prohibitions and that the current implementing regulations expressly permit an employee to "[r]un as a candidate in a nonpartisan election." Id. § 734.207(b). McEntee's argument founders, however, when he attempts to rely on these precepts to insulate from scrutiny his conduct as a candidate for public office. Reduced to its base, McEntee's challenge to the post-1993 vitality of the rebuttable presumption analysis is nothing more than an attempt to limit the definition of "nonpartisan election" to the standards provided by state and local election law. We have previously rejected such invitations to define federal statutory and regulatory terms solely by reference to state law. Campbell v. Merit Sys. Prot. Bd., 27 F.3d 1560 (Fed. Cir. 1994).

In Campbell, a case decided under the pre-1993 Hatch Act, we interpreted the regulations that permit certain employees to participate in partisan elections as "independent candidates," provided that they reside in municipalities with a majority of

---

[4] Nothing in this opinion should be read as addressing the question of whether the conduct of another candidate in a nonpartisan election could affect the entitlement of a federal employee candidate to participate. That question is not before us.

the voters employed by the federal government. Id. at 1568. In that case, we wisely refused to limit the definition of an "independent candidate" to the strictures of state law, primarily out of concern that "reducing the factual inquiry into 'independence' to an examination of a person's registration card and ballot billing would exalt form over substance and permit circumvention of the substantive congressional policy of keeping partisan politics out of the routine administration of the laws and the running of the bureaucracy." Id. Accordingly, we resolved Campbell by considering the facts presented to determine whether the employee's conduct in associating himself with the Democratic Party comported with the common meaning of the word "independent." Id. at 1568-69.

McEntee's invitation to define the regulatory term "nonpartisan election" by reference solely to local election laws presents the identical risk of exalting form over substance that we identified and avoided in Campbell. We follow Campbell's well-reasoned approach in rejecting that invitation in favor of a consideration of all the relevant facts at hand.[5] The First Circuit reached the same conclusion when presented with a similar invitation to define the limits of the Hatch Act. Magill v. Lynch, 560 F.2d 22, 29 (1st. Cir. 1977) (holding that "the government may constitutionally restrict its employees' participation in nominally nonpartisan elections if political parties play a large role in the campaigns"). Accordingly, we affirm the Board's application of the rebuttable presumption analysis to determine whether McEntee's participation in a presumptively nonpartisan election constituted a violation of the Hatch Act.

---

[5] Although Campbell interpreted the statutory scheme of the pre-1993 Hatch Act, the merit of its reasoning is not diminished by subsequent changes in the statutory language.

C.    The Constitutionality of the Hatch Act as Amended

McEntee argues that even if the rebuttable presumption analysis is not precluded by the terms of the current Hatch Act, its application violates the First Amendment. His constitutional arguments are premised on the concept that the analysis makes unlawful activities which are otherwise legal and therefore protected under the Hatch Act. Specifically, McEntee believes that the rebuttable presumption analysis unjustifiably burdens employees' constitutional rights to engage in political speech and that it is void for vagueness.[6]

As discussed above, McEntee's understanding of the effect of the analysis he refers to as the "transformation theory" is inaccurate. It is not a transformation as posited by McEntee that occurs, but rather a rebuttable presumption that is created. The rebuttable presumption analysis does not impose burdens on the political rights of employees beyond those provided for in the statute. Accordingly, McEntee's constitutional challenges are properly directed at the Hatch Act as amended.

Placed in the proper context, McEntee's constitutional arguments fail to acknowledge the clear precedent of the Supreme Court. The Court twice upheld the constitutionality of the pre-1993 Act against charges that it was vague, overbroad and placed an excessive burden on the free speech rights of federal employees. Letter Carriers, 413 U.S. at 556; United Pub. Workers of Am. v. Mitchell, 330 U.S. 75, 93 (1947). Despite prior case law conclusively determining that the sweeping prohibitions of the pre-1993 Hatch Act did not excessively burden the protected rights of federal

---

[6]    McEntee also asserts that the statute is overbroad, but his argument supporting that claim is indistinguishable from his assertion that the statute is void for vagueness. Accordingly, there is no need for us to separately address the overbreadth claim.

employees, McEntee attempts to argue that the more limited restrictions of the current statute impermissibly upset the balance of interests previously approved. McEntee's efforts are undermined by dicta from Letter Carriers in which the Court stated that the government has the power to prevent employees from engaging in precisely the activities with which McEntee is charged, namely "actively participating in fund-raising activities for a partisan candidate or political party" and "becoming a partisan candidate for, or campaigning for, an elective public office." Letter Carriers, 413 U.S. at 556. As we stated in our most recent prior case involving the Hatch Act, "precedent clearly precludes" an attack on the Act as an improper restraint on government employee speech.[7] Briggs, 331 F.3d at 1315.

McEntee asserts that while the Hatch Act itself may be constitutional, the application of the rebuttable presumption analysis is not because it blurs the dividing line between permitted and prohibited activities. This vagueness argument again fails to recognize that it is the statute, not the analysis, that creates this distinction. The appropriate inquiry, then, is not into the vagueness of the rebuttable presumption analysis, but rather whether the amended statute and its implementing regulations are sufficiently definite so as to give "fair warning . . . in language that the common world

_____

[7]     The recent Supreme Court decision of Republican Party of Minnesota v. White, 536 U.S. 765 (2002), does not change that analysis. White involved a state canon of judicial conduct that prohibited candidates for judicial office from announcing their views on disputed legal or political issues. Id. at 768. Because the canon prohibited speech based on its content and burdened a core category of protected speech, the Court applied strict scrutiny to assess its constitutionality. Id. at 774. The Court struck down the canon on the ground that it was not narrowly tailored to achieve the allegedly compelling state interest of ensuring the impartiality of the state judiciary. Id. at 780. Nothing in White, however, suggests that a statute, such as the Hatch Act, which is not targeted at restricting protected speech is subject to a heightened degree of scrutiny.

will understand, of what the law intends to do if a certain line is passed." United States v. Lanier, 520 U.S. 259, 265 (1997) (citation omitted). A statute will be found to be void for vagueness if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." Id.; see also Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972) (stating that vague statutes offend the principle that laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly"); Coates v. City of Cincinnati, 402 U.S. 611, 614 (1971) (holding a statute to be unconstitutionally vague because it subjected First Amendment rights to "an unascertainable standard"). In applying the void for vagueness doctrine in the First Amendment context, we have determined that the alleged vagueness must pose a real and substantial threat to protected expression such that a substantial amount of legitimate speech will be chilled. Griffin v. Sec'y of Veterans Affairs, 288 F.3d 1309, 1329-30 (Fed. Cir. 2002).

The only speech at issue here is that of federal employees serving as candidates for elective office.[8] McEntee argues that the statute does not clearly indicate that an employee-candidate's assertion of affiliation with a major political party could run afoul of the provisions of the Hatch Act. But the statute does not prohibit the bare speech with which McEntee is concerned. An employee-candidate is not barred from identifying his political philosophy, "I stand for the principles of the Republican Party," or

---

[8] The amended Hatch Act no longer restricts off-duty employees from engaging in other forms of expression connected with partisan political campaigns. See 5 C.F.R. § 734.205 (permitting off-duty employees to: "display pictures, signs, stickers, badges or buttons associated with political parties;" "initiate and circulate a nominating petition for a candidate for partisan political office;" "endorse or oppose partisan political candidates;" and "address a convention . . . or similar gathering of a political party").

stating his party status, "I am a Republican." The statute and regulations clearly indicate, however, that federal employees are not to participate as candidates in elections in which any candidate "represents" a major political party.

Although the term "represents" is not defined by the statute or the regulations, its ordinarily understood meaning includes more than the formal endorsement process advocated by McEntee. See Best Power Tech. Sales Corp. v. Austin, 984 F.2d 1172, 1177 (Fed. Cir. 1993) ("It is a basic principle of statutory interpretation . . . that undefined terms in a statute are deemed to have their ordinarily understood meaning."). While the definition of "represent" certainly includes "to be an accredited deputy or substitute for (a number of persons) in a legislative or deliberative assembly," it also encompasses "to describe as having a specified character or quality; to give out assert or declare to be of a certain kind" and "to symbolize, to serve as a visible or concrete embodiment." Oxford English Dictionary 657-58 (2d ed. 1989). Thus, the term "represent" as used in the Hatch Act refers not only to candidates who have received the formal endorsement of a major political party, but also to candidates who act in concert with a major political party. We hold that while an employee-candidate in a presumptively nonpartisan election may independently assert a party affiliation, once the candidate and the party act in concert with each other, a representative relationship may be established sufficient to rebut the presumption of nonpartisanship. Interpreted in this manner, the amended statute sufficiently puts an employee on notice that, when serving as a candidate for nonpartisan public office, he is prohibited from engaging in speech and conduct that indicate he is acting in concert with a major political party.

04-3066                                24

McEntee further complains that the statute does not indicate the level of partisan speech and conduct required to rebut the presumption that an election deemed to be nonpartisan under state law was, in fact, a partisan race from which federal employees are banned. Admittedly, the statute does not give employees an absolute right to participate in elections deemed to be nonpartisan under state law, but rather it gives employees the right to participate in elections in which no candidate represents a major political party. Admittedly the statute identifies no bright line rule for the level of political speech and conduct, on the part of either the candidate or the party, that is necessary to establish representation of a major political party. Although the standard for what constitutes representation of a major political party is certainly flexible, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989). McEntee has not established that the amended Hatch Act fails to "provide persons of ordinary intelligence a reasonable opportunity to know what is prohibited." Griffin, 288 F.3d at 1330. We do not believe that the statute is unconstitutionally vague.

D.    Evidentiary Support for the Board's Determination

McEntee's final challenge to the Board's decision is that it is not supported by substantial evidence. McEntee bases this claim on the assertion that in order for an election designated as nonpartisan under state law to be considered a prohibited race, a candidate must receive a formal endorsement by a national, state, or local body of a major political party. Because McEntee received no such endorsement, he believes that the 2001 Albuquerque mayoral race did not constitute an election for a partisan

political office. The error of this assertion has been fully addressed above and does not need belaboring.

Although we do not attempt to establish the minimum level of partisan politics necessary to rebut the presumption that an election designated as nonpartisan under state and local law is, in fact, a prohibited political race, there is no question that the record here amply supports the conclusion that the presumption of nonpartisanship afforded the 2001 Albuquerque Mayoral race was so rebutted. Here, McEntee openly solicited members of the Republican Party for campaign contributions and made it clear that he was requesting donations on the basis of party affiliation in order to further the party's agenda. He trumpeted his endorsement by the Executive Committee of the Bernalillo County Republican Party and individual Republican Party figures and appeared at press conferences with his endorsers.[9] Furthermore, leaders of the local and state Republican Party actively supported McEntee by publicly associating themselves with his campaign, advocating his election, and helping to raise funds in support of his candidacy. While we leave open the possibility that less blatant invocation of party status may not justify rebutting the presumption of nonpartisanship, there can be no doubt that the combination of McEntee's conduct as a candidate and the Republican Party's acquiescence in that conduct constitutes representing a major

---

[9]   McEntee contests the Board's decision to admit as evidence newspaper articles describing his campaign as partisan. There is ample evidence in the record supporting the Board's determination that the presumption of nonpartisanship was rebutted without relying on the challenged newspaper articles; therefore we need not address the merits of McEntee's objection.

political party such that the race in which he participated constituted an election for partisan political office.[10] The Board had substantial evidence to support its findings.

### III.  CONCLUSION

For the foregoing reasons, we affirm the Board's determination that McEntee violated the Hatch Act by running as a candidate for election to a partisan political office and by knowingly soliciting and receiving political contributions.

### IV.  COSTS

No costs.

<u>AFFIRMED</u>

---

[10]  McEntee also asserts that the precise point at which the election was established as partisan was not clear to him and therefore his fundraising efforts could not be described as the knowing solicitation or receipt of banned political contributions. The record does not support this assertion.  It shows that he held a fundraising event on September 14, 2001, two weeks after he was formally notified that the OSC believed that his activities violated the Hatch Act and one week after the deadline by which he needed to withdraw his candidacy or resign his federal employment.