NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**KALI WASHINGTON,**
*Petitioner*

**v.**

**FEDERAL BUREAU OF PRISONS,**
*Respondent*

---

2023-1566

---

Petition for review of arbitrator Roger Abram's decision in No. 220120-02725.

---

Decided:  February 12, 2025

---

JOHN-ED LONG BISHOP, Whitehead Law Firm, Baton Rouge, LA, argued for petitioner.  Also represented by JACK K. WHITEHEAD, JR..

LIRIDONA SINANI, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent.  Also represented by BRIAN M. BOYNTON, CLAUDIA BURKE, PATRICIA M. MCCARTHY.

---

Before HUGHES, STARK, *Circuit Judges*, and SCHROEDER, *District Judge.*[1]

STARK, *Circuit Judge*.

Kali Washington was terminated from her position as a Senior Correctional Officer at the Federal Detention Center in Miami, Florida ("FDC Miami") for three violations of policy: failure to follow a supervisor's instructions, failure to conduct special housing unit ("SHU") rounds, and introduction of contraband. An arbitrator sustained the removal decision and Ms. Washington appeals. We affirm.

I

The Bureau of Prisons ("BOP") terminated Senior Correctional Officer Kali Washington, effective January 13, 2022, for three violations of BOP policy that occurred in July and August of 2019. The first violation, failure to follow a supervisor's instructions, was based on Ms. Washington's refusal to work mandated overtime on two instances. FDC Miami policy authorizes supervisors to order correctional officers to work overtime to fill unstaffed positions. Employees are selected for mandatory overtime based on a rotating list of eligible officers. On July 19, 2019, Lieutenant Dale Williams ordered Ms. Washington, then the third employee on the list, to work overtime to cover an overnight shift. Lieutenant Williams had determined that the two employees listed ahead of Ms. Washington could not be mandated due to the hours they had already worked or other limitations set out in the BOP's agreement with the pertinent union. Ms. Washington refused to work the July 19 shift because her son was sick. The next day, a

---

[1]    Honorable Robert W. Schroeder III, District Judge, United States District Court for the Eastern District of Texas, sitting by designation.

supervisor[2] again ordered Ms. Washington to work a mandatory overtime shift, but she again refused, this time stating that she had already worked mandated overtime on July 18 and was therefore not the next eligible officer on the rotating list. Lieutenant Williams referred the incident to the BOP's Office of Internal Affairs ("OIA"), which conducted an investigation and found "sufficient evidence to support the allegation of Failure to Follow Supervisor's Instructions." J.A. 1157.

The second violation was Ms. Washington's failure to conduct surveillance rounds in FDC Miami's SHU. As part of her job, Ms. Washington was sometimes assigned to work in the SHU, a "jail within a jail" that houses high-security-level inmates who are kept in cells for 23 hours a day. J.A. 278; *see also* J.A. 502-03 ("[T]he [SHU] is where we house inmates that are either disruptive, do not comply with the rules and regulations, or we need to keep safe from the other inmate populations pending an investigation."). FDC Miami's SHU is divided into four quads: northeast, northwest, southeast, and southwest. BOP policy requires that "[a] staff member must observe all inmates confined in [the SHU] . . . [in] rounds . . . to be conducted on an irregular schedule and no more than 40 minutes apart." J.A. 1184.

On August 24, 2019, Ms. Washington was staffed as the SHU #2 officer for a shift spanning 1:45 p.m. to 9:45 p.m., along with Officers Jason Patrick (the SHU #1, and therefore primary, officer) and Anibal Martinez (the SHU #3 officer). BOP policy provides that the SHU #2 and SHU

---

[2]    The record is unclear as to whether it was Lieutenant Williams or another supervisor, Lieutenant Moselina, who ordered Ms. Washington to work the overtime shift on July 20. *Compare* J.A. 1121 (Referral of Incident report stating Lt. Williams gave order) *with* J.A. 1123 (witness affidavit stating Lt. John Moselina gave order).

#3 officers are responsible for assisting the SHU #1 officer "in maintaining the overall safety, security and orderly running of the" SHU. J.A. 1191, 1195. At 6:43 p.m. that night, Officer Patrick discovered that an inmate in the northwest quad had committed suicide in his cell. An investigation into the circumstances leading to the suicide revealed video surveillance footage showing that none of the three on-duty SHU officers had performed the required rounds on the northwest quad between 4:06 p.m. and 5:17 p.m., a period of 71 minutes. Consequently, FDC Miami's Warden at the time, Geo Ramirez, referred all three on-duty SHU officers to OIA for failure to follow policy. OIA determined through its investigation that Officer Martinez had falsified logs to indicate that he had made rounds in the northwest quad every 30 minutes when, in fact, he had not actually done so.

The same video surveillance footage led to the third charge against Ms. Washington: introduction of contraband. She was seen in the video performing rounds while wearing a Bluetooth-enabled earpiece, specifically an Apple AirPod, in her right ear. Ms. Washington later admitted that she "violated policy when [she] brought the ear phones into the institution." J.A. 1208. She explained that the AirPods "were connected to [her] watch and [she] used them to listen to music [she had] saved on [her] watch," adding that without a phone the AirPods were "not capable [of] operating independently to make calls." *Id.* An OIA investigation sustained the charge of "Unauthorized Electronic Device Introduction." J.A. 1222; *see also* J.A 1016 (policy prohibiting officers from "[i]ntroducing . . . contraband into or upon the [prison] grounds . . . without the CEO's knowledge and consent").

On March 17, 2021, Ms. Washington received a proposal letter from the BOP recommending she be suspended for 35 days as discipline for the three violations of policy. Nearly five months later, on August 3, 2021, the BOP sent Ms. Washington a new proposal letter, this one rescinding

the proposed 35-day suspension and instead recommending termination. On January 13, 2022, the then-FDC Miami Warden, Eugene Carlton, terminated Ms. Washington's employment, effective immediately. Warden Carlton's letter analyzed each of the factors laid out in *Douglas v. Veterans Admin.*, 5 MSPB 313, 5 M.S.P.R. 280, 307-08 (1981),[3] and concluded "there is no alternative but to remove [Ms. Washington] from [her] position." J.A. 1256.

Ms. Washington appealed the decision to an arbitrator. In addition to assessing whether the three charges against Ms. Washington should be sustained, the arbitrator also evaluated "whether [Ms. Washington's] misconduct warranted her removal after twelve years of service to the Agency [i.e., the BOP]." J.A. 10. The arbitrator, while recognizing that removal is a serious penalty, concluded that Ms. Washington's removal was "for just and sufficient cause." J.A. 14. In reaching this conclusion, he found that Ms. Washington's own affidavits substantially supported the BOP's charges against her. In particular, the arbitrator found that Ms. Washington "knew about the Agency's mandated overtime procedure" and, when she refused to work mandated overtime, "demonstrated 'a marked deficiency' in the performance of her job functions." J.A. 12. The arbitrator also sustained the charged failure to conduct SHU rounds based on his finding that Ms. Washington "admitted that she did not perform all her [SHU] rounds." J.A. 11. With respect to the contraband charge, the arbitrator determined that "[e]lectronic devices such as AirPods fall into [the contraband] category," which

---

[3] In taking adverse action against an employee, an agency such as the BOP "must demonstrate that the penalty imposed was reasonable in light of the relevant factors set forth in *Douglas*." *Malloy v. United States Postal Serv.*, 578 F.3d 1351, 1356 (Fed. Cir. 2009).

includes "anything that could threaten the security and orderly running of an institution," adding that Ms. Washington demonstrated "her attitude of indifference towards [BOP] policy" by bringing contraband into the prison. J.A. 13. Finally, in response to Ms. Washington's complaint that the BOP had failed to complete its investigation within the recommended 120-day period, the arbitrator concluded that she had not been prejudiced by the delay because she "was certainly on notice that all these matters were being investigated." J.A. 13. The arbitrator ultimately concluded that the penalty of termination was warranted.[4]

Ms. Washington timely appealed. The arbitrator had jurisdiction pursuant to 35 U.S.C. § 7121(d). We have jurisdiction to review the arbitrator's decision pursuant to 5 U.S.C. § 7121(f) and 5 U.S.C. § 7703(b).

II

We review an arbitrator's decision under the same standard we apply to decisions of the Merit Systems Protection Board. *See* 5 U.S.C. § 7121(f). Under this standard, we must "set aside any agency action, findings, or conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c). "Substantial evidence is such relevant evidence as a reasonable mind

---

[4] The arbitrator indirectly referenced some of the *Douglas* factors in his decision. *See e.g.*, J.A. 12 ("She had been thoroughly trained on her duties as a SHU officer, and she offered no contrition or excuse for her failure."); *id.* ("[Ms. Washington] knew about [BOP] mandated overtime procedure."); J.A. 13 ("Even long seniority counts for only so much.").

might accept as adequate to support a conclusion." *McEntee v. Merit Sys. Prot. Bd.*, 404 F.3d 1320, 1325 (Fed. Cir. 2005) (internal quotation marks omitted). Ms. Washington "bears the burden of establishing that the arbitrator committed reversible error." *Boss v. Dep't of Homeland Sec.*, 908 F.3d 1278, 1280 (Fed. Cir. 2018).

## III

On appeal, Ms. Washington challenges the misconduct charges against her and alleges that the BOP committed several prejudicial procedural errors. We address each argument in turn.

## A

Ms. Washington largely concedes that it was not arbitrary and capricious for the BOP to find she failed to follow a supervisor's instructions to perform mandatory overtime. In her affidavit, Ms. Washington declared that she did not remember being mandated to work on July 19, 2019, but she nonetheless "acknowledge[d] that [she] must have told the Operations Lieutenant 'No' on July 19, 2019, when asked to stay for the overtime shift." J.A. 1128. As for the July 20, 2019 mandate, Ms. Washington admitted to receiving the mandate to work and refusing it based on her mistaken belief that she had responded to a mandate earlier that week. Ms. Washington acknowledges in her briefing on appeal that "the evidence and testimony could have sustained . . . the failure to work mandated overtime [charge]." Open. Br. 35.

BOP's Standards of Employee Conduct state that "[e]mployees are to obey the orders of their superiors at all times." J.A. 1015. Ms. Washington signed a form acknowledging that her "conduct is governed by" these Standards of Employee Conduct. J.A. 1068. As Ms. Washington admitted to not complying with her supervisor's instruction to work mandated overtime, and does not argue on appeal that she was somehow permitted to refuse the order, we

have no basis to disturb the arbitrator's decision to uphold the BOP's finding of a violation.

B

Ms. Washington contends that substantial evidence does not support the arbitrator's decision sustaining the charge that she failed to conduct surveillance rounds in the SHU on the evening that an inmate committed suicide. We disagree.

BOP policy requires that "[a] staff member must observe all inmates confined in [the SHU] . . . [in] rounds . . . to be conducted on an irregular schedule and no more than 40 minutes apart." J.A. 1184. It is undisputed that no staff member observed all inmates confined in the northwest quad of the SHU between 4:06 p.m. and 5:17 p.m., a total of 71 minutes, on the evening of August 24, 2019, and that shortly thereafter an inmate in the northwest quad was found to have committed suicide.[5]  The only dispute is whether there was something improper in the BOP holding Ms. Washington responsible for this failing. There was not.

Ms. Washington explains to us, as she earlier did to the BOP and the arbitrator, that she and another SHU Officer

---

[5]    Both the Warden and the arbitrator noted in their respective decisions that no SHU round was performed in the northwest quad between 6:00 p.m. and 6:30 p.m. that same night, during which time the inmate may have committed suicide. *See* J.A. 11 (arbitrator finding "[d]uring the time Ms. Washington was not doing her rounds, a prisoner hung a sheet in his cell and committed suicide"); J.A. 1255 (removal decision stating "the required SHU rounds that were missed, especially during the time frame between 6:00 p.m. to 6:30 p.m., may have assisted in preventing the suicide of [the] inmate"). Ms. Washington at no point argues that she or any other SHU officer completed the 6:00 p.m. to 6:30 p.m. round on the northwest quad.

on duty, Officer Martinez, agreed to split that day's rounds between themselves, with Ms. Washington performing rounds on the southeast and southwest quads and Officer Martinez agreeing to complete rounds on the northeast and northwest quads. She contends that this informal agreement relieved her of any personal responsibility for conducting rounds in the northeast or northwest quads for which, in her view, Officer Martinez bore sole responsibility. The government acknowledges that dividing rounds in this manner is a common and permissible practice. *See* Gov. Br. at 31 ("[T]he officers were free to divide the rounds up . . . ."); *id.* at 32 ("[O]nly one officer must actually walk the SHU's corridors . . . ."); *id.* at 33 ("SIA Newsome and the Warden's testimony both acknowledged that splitting up the required rounds among the officers on duty does occur."); *see also* J.A. 1186 (post orders requiring "a staff member will make rounds and observe the activity of every inmate" every 30 minutes). Officer Martinez, not Ms. Washington, also fraudulently initialed a log, falsely indicating that he had completed rounds every 30 minutes in the northwest quad. But none of this absolves Ms. Washington of her responsibility – a responsibility Officers Martinez and Patrick each also bore – to ensure that all the required rounds were conducted in all parts of the SHU, including the northwest quad. We are not tasked with assessing the relative culpability of Ms. Washington compared to her fellow officers, only with determining whether there is substantial evidence that Ms. Washington failed to fulfill her own obligation to ascertain that all quads in the SHU were regularly inspected on a schedule complying with the policy. We find that there is such evidence, as we describe below.

In her affidavit, Ms. Washington acknowledges the realities of her responsibility. There she admitted "[t]he range rounds were not assigned to any specific individual" and "it was the responsibility of all Special Housing staff to [e]nsure rounds were complete." J.A. 1172. While she does

not admit that she violated this policy, she does admit it was "a violation of policy [to] allow[] 1 hour and 11 minutes" to elapse between rounds, which is precisely what occurred on August 24, with respect to the rounds in the northwest quad. J.A. 1172. These facts provide substantial evidence for the BOP's finding that Ms. Washington violated policy by failing to conduct SHU rounds.

Ms. Washington's arguments against this conclusion are unavailing. Ms. Washington points out, correctly, that the arbitrator repeatedly stated that Ms. Washington admitted she failed to conduct *her* rounds. *See* J.A. 2 ("Most significantly, she failed to complete her rounds in the [SHU] . . . ."); J.A. 3 ("The Grievant admitted that she did not do all her rounds on August 24, 2019."). To the extent the arbitrator was finding that Ms. Washington admitted she did not conduct rounds in the southeast and southwest quads, the areas of the SHU she and Officer Martinez agreed she would do rounds on, this finding is incorrect. However, any error in connection with this finding is harmless given the undisputed fact that no SHU officer conducted rounds in the northwest quad for 71 minutes. *See Valles v. Dep't of State*, 17 F.4th 149, 152 (Fed. Cir. 2021) (applying harmless error rule to appeal of removal decision). As we have explained, because all three SHU officers were responsible for ensuring that rounds were conducted in all parts of the SHU, the fact that this did not occur is sufficient to provide substantial evidence for the arbitrator's finding that Ms. Washington failed to follow policy.

Ms. Washington also suggests that the BOP erred in pursuing an unfair policy that essentially imposes strict liability on any SHU officer who happens to be on duty when another SHU officer does not live up to commitments made to a fellow officer. *See* Reply Br. at 1 ("[T]he [BOP] insists that all officers should work as detectives and examine clues on their shifts to determine whether their fellow officers are actually performing their rounds. These officers should be highly suspicious of one another and not trust

anything that the other officers say because, ultimately, they could be held accountable for another officer's actions."). Whether or not her accusations accurately characterize the BOP's policy, Ms. Washington has not identified any legal bar to the BOP's policy and its enforcement of it here.

Thus, again, substantial evidence supports the BOP's finding that Ms. Washington violated policy by failing to conduct SHU rounds.

C

Ms. Washington argues that the arbitrator erred by adopting the BOP's finding that she violated its policy against introducing contraband into the facility by bringing AirPods into FDC Miami for her personal use. BOP Program Statement 3420.11, "Standards of Employee Conduct," states:

> Introducing or attempting to introduce contraband into or upon the grounds of any Federal correctional institution, or taking or attempting to take contraband out of it, without the CEO's knowledge and consent, is prohibited.

> Staff may bring personal items into or upon the grounds of an institution, unless otherwise prohibited by the Warden. Such items must remain in the possession of the employee, and /or be secured away from inmates, and disposed of properly when no longer needed.

J.A. 1016. The "Staff Entrance and Search Procedures" provision of Program Statement 3740.02 provides a definition of "Prohibited Objects" which includes "electronic devices," at least when such devices "could jeopardize the [BOP's] ability to ensure the safety, security, and orderly operation of [BOP]facilities, and protect the public." J.A. 1333, 1335-36. The BOP alleged that Ms. Washington

violated these policies because AirPods are "electronic de-vices." J.A. 1228.

In a case presenting different circumstances we might be required to interpret arguable ambiguities in these pol-icies. Here, however, there is essentially nothing for us to analyze because Ms. Washington herself, in her affidavit, expressly admitted she violated BOP policy: "I do acknowledge[] that I violated policy when I brought the ear phones into the institution." J.A. 1208; *see also* Oral Arg. at 1:50-2:10 (counsel acknowledging Ms. Washington's ad-mission regarding contraband).[6] On this record, Ms. Wash-ington has failed to show any abuse of discretion by the arbitrator or the BOP.

D

Finally, Ms. Washington argues that the arbitrator committed several prejudicial procedural errors. We are unpersuaded.

First, Ms. Washington contends that the arbitrator was required to reweigh the *Douglas* factors because, in her view, the Warden admitted that she had performed one of the allegedly incomplete rounds, so at least one of the grounds for her removal was not proven. While Warden Carlton did testify before the arbitrator that Ms. Washing-ton had performed rounds between 5:00 p.m. and 5:30 p.m., this only undermined the evidence for specification number 2 of charge 1, leaving intact – in the view of the Warden, and us as well – the substantial evidence that Ms. Wash-ington was liable on specifications 1 and 3 of charge 1 (i.e., the failure to conduct SHU rounds between 4:30 p.m. and 5:00 p.m., and again between 6:00 p.m. and 6:30 p.m.). J.A. 587 (Warden Carlton admitting mistake as to specification

---

[6] Available                  at                  https://oralargu-ments.cafc.uscourts.gov/default.aspx?fl=23-1566_1204202 4.mp3.

2 of charge 1); J.A. 635-36 (Warden Carlton stating he "100 percent" agreed removal was appropriate despite mistake on specification 2).  Thus, the original charge remained intact, even if one of the three underlying specifications – any one of which could have sustained the charge – was in error.  Consequently, there was no requirement that the arbitrator reweigh the *Douglas* factors.

Second, Ms. Washington insists that she was prejudiced by unreasonable delay in the BOP investigation into her case, and that the arbitrator abused his discretion by finding otherwise.  Ms. Washington's removal became effective in January 2022, two and one-half years after her charged misconduct, which occurred in July and August of 2019.  Because investigations of this nature are supposed to be completed within a recommended 120 days, *see* J.A. 214-15, Ms. Washington asserts that she was prejudiced by the slow pace with which the investigation of her conduct proceeded.

While the length of time the BOP took in completing its investigation is regrettable, and several witnesses Ms. Washington would like to have called to testify before the arbitrator were no longer employed by the BOP when her hearing was finally held, Ms. Washington has failed to show that the "delay was harmful to . . . her defense." *Villareal v. Bureau of Prisons*, 901 F.3d 1361, 1366 (Fed. Cir. 2018).  That is, she has not demonstrated that the delay "substantially impair[ed her] rights such that it likely caused the agency to reach a different decision than it would have otherwise." *Id.* (internal quotation marks omitted).  The BOP bore the burden of proving the charges brought against Ms. Washington and it presented the evidence it believed would meet that burden, including by calling the witnesses it chose to call. *See generally Archuleta v. Hopper*, 786 F.3d 1340, 1352 (Fed. Cir. 2015).  While the BOP was obligated to "pay travel and per diem expenses" for certain employee witnesses, J.A. 984, Ms. Washington has cited nothing precluding other witnesses from being

called as well.  The record is devoid of any indication that Ms. Washington attempted to subpoena witnesses to testify on her behalf or was precluded from doing so.  More importantly, the only relief Ms. Washington sought for the BOP's failure to bring certain witnesses to the hearing – Officers Martinez and Patrick, Warden Ramirez, Captain J. Weirich (the initial proposing official), Captain Miguel Medina (the second proposing official), and SIA Bobby Roy – was a request that the arbitrator draw an adverse inference against the agency.  *See* J.A. 753-55 ("[W]e will be formally requesting an adverse inference be made concerning the non-testimony of these called witnesses.").    But Ms. Washington has not appealed the arbitrator's denial of this request, *see* Oral Arg. at 3:42-4:02 (Ms. Washington's counsel agreeing denial of adverse inference is not part of appeal), leaving us no basis to take any action.

Ms. Washington, in her reply brief, also argues she was prejudiced because the BOP modified its policy during the pendency of her case to require a heightened penalty, termination, when a correctional officer violates policy in connection with an inmate suicide.  *See* J.A. 166-67 (Human Resources testifying that BOP raised Ms. Washington's penalty because "disciplinary got more strict as far as SHU rounds" following Jeffrey Epstein's suicide).  This argument was forfeited because it was not included in her opening brief.  *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are [forfeited].").  In any event, even though the Warden's initial proposed punishment was a 35-day suspension, termination was always available as a possible sanction even before the policy change, and the 35-day proposal was never finally imposed on Ms. Washington.  *See* J.A. 1030 (listing removal as possible sanction for first offense of failure to carry out work assignments or obey direct order); J.A. 1040 (same for introduction of contraband).  Nor does Ms. Washington cite any authority making it improper to

sanction her under the policy in effect at the time the sanction was being imposed.

Third, Ms. Washington alludes to her due process rights having been violated. *See* Open. Br. at 25 ("The Arbitrator's Decision . . . Violated [Ms. Washington's] Due Process Rights"). The alleged due process violation appears to be BOP's supposed failure to provide Warden Carlton with certain potentially mitigating documentary evidence. *See id.* at 26 ("[Ms. Washington's] performance evaluations were not included in the discipline packet to Warden Carlton."); *id.* at 31 ("[V]ital documents, such as security footage of her executing her duties, were absent [from her case]."); *id.* at 32 ("The [Human Resources] manager only shared documents that supported Officer Washington's termination with the Warden, leaving her with insufficient documentation to defend herself."). We are not in a position to evaluate the merits of Ms. Washington's argument, however, as she has failed to cite record support or any authority in support of her contentions. *See SmithKline,* 439 F.3d at 1320 ("[A] passing reference to an issue . . . will not suffice to bring that issue before this court.").

Finally, Ms. Washington argues she was prejudiced because one official, Captain Weirich, signed the 35-day suspension proposal letter, while a different official, Captain Medina, later substituted for Captain Weirich and then rescinded and replaced the suspension with a proposal for termination. Ms. Washington contends that our decision in *Boddie v. Department of Navy*, 827 F.2d 1578 (Fed. Cir. 1987), held that "[w]hen the proposing official is substituted for another official at the last minute, it constitutes a harmful error." Open. Br. 29. This mischaracterizes the scope of our holding in *Boddie.* There, we determined that the Navy's "last-minute substitution" – specifically, the replacement of the proposing official, who was the employee's first-level supervisor, by a higher-ranked official – "deprived [the employee] of his right, granted in the Navy

Yard's regulation, to have his own first-level supervisor propose the charges against him and the discipline to be imposed on him." *Boddie*, 827 F.2d at 1580; *see also Bross v. Dep't of Commerce*, 389 F.3d 1212, 1216-18 (Fed. Cir. 2004) (assessing whether substitution of proposing official violated employee's rights under labor agreement that provided "Division Chiefs or their equivalents will normally serve as both Proposing and Deciding Official"). Ms. Washington has not identified any similar regulation applicable here or alleged a right to have a specific official propose or decide the discipline for her misconduct. Therefore, her argument lacks merit.

In sum, Ms. Washington's procedural arguments provide no basis for reversal.

V

We have considered Ms. Washington's remaining arguments and find they lack merit. Accordingly, for the reasons given above, we affirm the arbitrator's judgment sustaining the BOP's termination of Ms. Washington for her violations of BOP policy.

**AFFIRMED**

COSTS

No costs.